ROOD v GENERAL DYNAMICS CORPORATION

SCHIPPERS v SPX CORPORATION

Docket Nos. 93416, 93968. Argued April 1, 1993 (Calendar Nos. 10-11). Decided September 21, 1993. Rehearings denied *post,* 1203.

Richard A. Rood, M.D., brought an action in the Macomb Circuit Court against the General Dynamics Corporation, alleging wrongful discharge in breach of a just-cause contract. The court, Robert J. Chrzanowski, J., granted summary judgment for the defendant. The Court of Appeals, CYNAR and BRENNAN, JJ. (DANHOF, C.J., dissenting), reversed in an unpublished opinion per curiam (Docket No. 117470). In lieu of granting leave to appeal, the Supreme Court remanded the case to the Court of Appeals for reconsideration in light of *Rowe v Montgomery Ward & Co, Inc,* 437 Mich 627 (1991). After remand, the Court of Appeals, DANHOF, C.J., and GRIFFIN, J. (BRENNAN, J., dissenting), reversed its original decision in an unpublished opinion per curiam (Docket No. 145598). The plaintiff appeals.

Joseph Schippers brought an action in the Muskegon Circuit Court against the SPX Corporation, alleging wrongful discharge in breach of a just-cause contract. The court, Michael E. Kobza, J., granted summary judgment for the defendant. The Court of Appeals, NEFF, P.J., and MAHER and MURPHY, JJ., reversed (Docket No. 117549). The Supreme Court, in lieu of granting leave to appeal, remanded the case to the Court of Appeals for reconsideration in light of *Rowe.* After remand, the Court of Appeals, NEFF, P.J., and MICHAEL J. KELLY and REILLY, JJ., reaffirmed its original holding (Docket No. 147499). The defendant appeals.

In an opinion by Chief Justice CAVANAGH, joined by Justices BRICKLEY, BOYLE, RILEY, GRIFFIN, and MALLETT, the Supreme Court *held:*

A claim for wrongful discharge may be supported by contract or public policy. In these cases, while there was insufficient evidence under the contract theory to overcome the presumption of employment at will, in *Rood,* the employer's written

REFERENCES

Am Jur 2d, Master and Servant §§ 27, 45.

See ALR Index under Labor and Employment.

policies and procedures were sufficiently clear and definite to create a question for the jury regarding the existence of a just-cause employment relationship.

1. Employment contracts of indefinite duration are presumed to be terminable by either party for any or no reason. To overcome the presumption, sufficient proof either of a provision for a definite term of employment or one forbidding discharge except for just cause must be shown. Express or implied promises or employer policies and procedures that instill legitimate expectations of just-cause employment may be sufficient and may become legally enforceable parts of an employment relationship.

2. Oral statements of just-cause employment must be clear and unequivocal, and the circumstances surrounding them must objectively show that a reasonable person would have interpreted them to provide a just-cause relationship. In these cases, viewing the evidence in a light most favorable to the plaintiffs, there is no evidence from which a reasonable juror could infer that the employers intended to provide just-cause employment.

3. Where a legitimate expectations theory is asserted, the trial court should examine the employer's policy statements concerning employee discharge to determine whether they are capable of reasonably being interpreted differently, and thus questions for the jury. In *Schippers*, the statements were insufficient. In *Rood*, the policies and procedures could have instilled a legitimate expectation of just-cause employment, requiring reversal and remand for further proceedings.

*Rood,* reversed and remanded.

*Schippers,* reversed.

Justice LEVIN, concurring in part and dissenting in part, stated that the evidence presented by the plaintiffs is sufficient to create a question of material fact whether oral assurances, written company policies, and company procedures and practices gave rise to a contract of just-cause employment under *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 479 (1980). It cannot properly be said that all reasonable persons would agree that no such contract was created between the parties.

194 Mich App 52; 486 NW2d 89 (1992) reversed.

MASTER AND SERVANT — TERMINATION FOR CAUSE — ORAL PROMISES.

Express or implied promises or employer policies and procedures that instill legitimate expectations of just-cause employment may be sufficient and may become legally enforceable parts of an employment relationship; oral statements of just-cause em-

ployment must be clear and unequivocal, and the circumstances surrounding them must objectively show that a reasonable person would have interpreted them to provide a just-cause relationship.

*Sachs, Waldman, O'Hare, Helveston, Hodges & Barnes, P.C.* (by *Mary Katherine Norton*), for the plaintiff in *Rood.*

*McCroskey, Feldman, Cochrane & Brock, P.C.* (by *John P. Halloran*), for the plaintiff in *Schipppers.*

*Butzel, Long, P.C.* (by *John P. Hancock, Jr., Barbara T. Pichan,* and *Susan A. Hartmus*), for the defendant in *Rood.*

*Culver, Lague & McNally* (by *Kevin B. Even*) for the defendant in *Schippers.*

Amicus Curiae:

*Mark Granzotto, Monica Farris Linkner,* and *Charles P. Burbach,* for Michigan Trial Lawyers Association.

*Clark, Klein & Beaumont* (by *Dwight H. Vincent, J. Walker Henry, Rachelle G. Silberberg,* and *Patricia Bordman*) for Michigan Manufacturers Association.

*Stark & Gordon* (by *Sheldon J. Stark, Martha I. Seijas*) for National Lawyers Guild, *Edgar Jerome Dew* for National Conference of Black Lawyers, *Reginald M. Turner, Jr.,* for Wolverine Bar Association, *Paul J. Denenfeld* for American Civil Liberties Union, and *Charlene M. Snow* for Women Lawyers Association of Michigan.

*Varnum, Riddering, Schmidt & Howlett* (by

*Joseph J. Vogan*) for Michigan Chamber of Commerce and The Employers' Association.

CAVANAGH, C.J. In these wrongful discharge actions, we are asked to examine employer oral representations and written policy statements to determine the existence of alleged employment agreements terminable only for cause. In *Rood,* we find that the employer's written policy statements were sufficiently clear and definite to create a jury question, regarding the existence of a just-cause employment relationship. In *Schippers,* however, we cannot so find. Consequently, we reverse the judgments of the different panels of the Court of Appeals.

I

A. *SCHIPPERS v SPX CORP*

For fourteen years, plaintiff Joseph Schippers was employed as an "over-the-road" truck driver by defendant SPX Corporation. For approximately 12½ of those years, Mr. Schippers was employed at the SPX-Sealed Power Division. In August 1986, Mr. Schippers transferred from Sealed Power to another division within SPX, the Hy-Lift Division, which had only one truck and one driver, Mr. Schippers.

SPX leased its trucks, including the truck driven by Mr. Schippers, from defendant Ryder Truck Rental. As part of the lease agreement between SPX and Ryder, SPX agreed to operate the trucks in a safe and careful manner.[1] On January 28, 1987,

---

[1] Specifically, the lease provided:

Upon receipt of a written complaint from Ryder specifying any reckless, careless or abusive handling of the Vehicle or any other incompetence by or of any driver, and requesting his

Ryder's district controller, Peter Stanley, sent a letter to Hy-Lift's production control manager, Larry Bozik, informing him that Mr. Schippers had been involved in three accidents and that Ryder was placing Mr. Schippers on probation.[2] Hy-Lift's employee relations manager, Patrick E. Goresch challenged the basis for Ryder's decision and requested proof to establish its claim.[3] Ryder

---

removal as a driver of Vehicles[, SPX] will immediately remove such individual as a driver of Vehicles. In the event that [SPX] shall fail to do so, or shall be prevented from so doing by any agreement with anyone on the driver's behalf: . . . [SPX] shall, notwithstanding any other remedies of Ryder or provisions of this agreement, reimburse Ryder in full for any loss and expense sustained by Ryder for damage to any Vehicle when being operated by such individual and [SPX] shall release, indemnify and otherwise hold Ryder completely harmless from and against any claims or causes of action for death or injury to persons or loss or damage to property arising out of the use or operation of any Vehicle when being operated by such individual notwithstanding that Ryder may be designated on applicable Schedules A as responsible for furnishing and maintaining liability insurance . . . .

[2] Mr. Stanley wrote:

This letter serves as a notice that if Joseph Schippers is involved in another occurrence resulting in property damage, personal injury or is guilty of other reckless, careless or abusive handling of a motor vehicle, we may request that he not be permitted to operate a Ryder vehicle.

[3] Mr. Goresch wrote:

In response to your letter dated 1-28-87, regarding [Mr. Schippers]; you make reference to and/or imply that Joseph Schippers has operated your equipment in a reckless, careless or abusive manner.

Please be advised that your letter has generated a great deal of concern with Hy-Lift Division, Sealed Power Corporation. More specifically, that this company does not agree and has no knowledge that Mr. Schippers was:

—at fault in my estimation of the alleged accidents;

—that he has operated the equipment in an unsafe and/or careless fashion;

—nor has he been cited for any violation in connection with the so stated accidents.

never sent the requested information and nothing further occurred until August 1987.

On August 6, 1987, approximately one year after his transfer to Hy-Lift, Mr. Schippers was involved in a traffic accident. While Mr. Schippers claims that the accident was caused by a "steering malfunction,"[4] an investigation conducted by Ryder indicated that the accident occurred because Mr. Schippers fell asleep at the wheel. In any event, Ryder notified spx that, pursuant to the lease agreement, it was requesting that Mr. Schippers not be permitted to operate any of its vehicles. Ryder further warned spx that if it allowed Mr. Schippers to operate any of its vehicles, then spx would be in breach of contract and liable for all personal injury and property damage resulting from any accident involving Mr. Schippers after the date of the letter.

Following receipt of this letter, spx initiated its own investigation. The investigation revealed that this was not Mr. Schippers' first accident; it was only "one of many which occurred while Schippers was a truck driver for spx." On the basis of the

---

Further, it is the request of this company that you provide this company with additional information regarding the incidents which generated your letter of 1-28-87.

You make charges and/or accusations regarding Mr. Schippers driving behavior, however, you fail to substantiate this claim. Please, without delay supply any and/or all proof you may have regarding this issue.

Continuing, there appears to be a great deal of ambiguity surrounding this issue. Mr. Schippers reports that he is continually subjected to embarrassing comments regarding his long term employment. These comments appear to come from managers within your organization. Please be advised that this company finds the comments (which are debasing in nature) unnecessary. As to his long term employment status, that issue will be decided by this company exclusively.

[4] There is evidence indicating that Mr. Schippers had reported a steering problem to Ryder on numerous occasions in the past. One Ryder mechanic who had taken the truck on a test drive, even told Mr. Schippers: "I don't know how you hold this on the road."

investigation, an SPX risk-management employee, James Sheridan, determined that of all SPX truck drivers employed, Schippers presented the greatest risk to the enterprise.

Mr. Schippers was terminated on September 4, 1987. He commenced this action against SPX in Muskegon Circuit Court, on June 15, 1988, claiming that his discharge violated his employment agreement, which provided for discharge only for cause and negligent evaluation. The trial court granted SPX's motion for summary judgment on both counts, but the Court of Appeals reversed. 186 Mich App 595; 465 NW2d 34 (1990). SPX filed an application for leave to appeal in this Court, which, in lieu of granting leave, remanded to the Court of Appeals for reconsideration in light of *Rowe v Montgomery Ward & Co, Inc,* 437 Mich 627; 473 NW2d 268 (1991). 439 Mich 895 (1991). On remand, the Court of Appeals reaffirmed its original holding. 194 Mich App 52; 486 NW2d 89 (1992). We subsequently granted SPX's application for leave to appeal, 441 Mich 881 (1992), and we reverse.

### B. *ROOD v GENERAL DYNAMICS CORP*

The plaintiff, Dr. Richard Rood, began working for Chrysler Corporation at its Hamtramck plant in 1968 as a per diem plant physician. In 1970, he converted to a salaried employee at the urging of his supervisor, Dr. George Olson. Dr. Rood's employment responsibilities included the performance of physicals for newly hired workers and workers returning to work, and workers' compensation evaluations. He also was responsible for providing general medical care for plant employees.

In 1972, Dr. Rood was promoted to senior plant physician at the Hamtramck plant. This position

required the supervision of other doctors and nurses. He performed this function until Chrysler closed its Hamtramck plant in 1980 and transferred Dr. Rood to the Detroit tank plant, where he assumed the role of plant physician, working under the direct supervision of the personnel manager, Owsley Spiller.[5]

Chrysler sold the Detroit tank plant in March 1982 to the defendant, General Dynamics Land Systems (GDLS), which retained the entire plant medical department, including Dr. Rood as plant physician. As a result, Dr. Rood continued to report to Mr. Spiller, and his duties remained essentially the same.

GDLS had three plants in separate states[6] and each plant had its own plant physician who reported to nonmedical personnel. The new vice president of human resources, Donald Norman, testified that he desired to create a more efficient means of handling the various medical facilities at the three plants. As a result, he established the position of division medical director to oversee all the division's medical personnel, and only that person reported to Mr. Norman. When filling this new position, Mr. Norman bypassed Dr. Rood[7] and

---

[5] Because the new position did not require the supervision of other medical personnel, Dr. Rood took a pay cut and title reduction.

[6] Detroit, Michigan; Lima, Ohio; and Scranton, Pennsylvania.

[7] In his deposition, Mr. Norman testified that Dr. Rood had experienced difficulty in completing two division-wide projects. The first project involved the development of standing orders, including a nurse's guidebook on patient care and treatment, to be used throughout the various plants. According to Mr. Norman, Dr. Rood never completed this assigned task. The second project concerned the development of a company-wide computer system, called Health Net. Mr. Norman sent Dr. Rood to GDLS' headquarters in St. Louis as the representative of the Detroit Division. At the meeting, each division representative was given certain information gathering tasks to aid in the development of the system. According to Mr. Norman, Dr. Rood was unable to complete his assigned task in the allotted time. In short, GDLS claims that Dr. Harper was hired because it believed that

hired another doctor, Dr. Charles R. Harper, who had an extensive background as a medical director in other corporations. GDLS contends that, after hiring Dr. Harper, an economic concern developed. At the time of his termination, Dr. Rood's annual salary was $59,000 and Dr. Harper's starting salary was $70,000. According to Mr. Norman, it was not economically feasible for GDLS to have both a full-time plant physician and a division medical director. He, therefore, purportedly decided that the division medical director would perform both the division-wide responsibilities as well as the duties of the plant physician at the Detroit plant and Dr. Rood's position was eliminated. Dr. Rood challenges the reasons for his dismissal, however, claiming that the hiring of Dr. Harper was solely to replace him.[8] In any event, in December 1984, the then-director of personnel relations, William Pagen, informed Dr. Rood that GDLS "had decided to replace" him and that he could either submit a letter of resignation or be fired.[9] Dr. Rood submitted his letter of resignation that became effective on January 4, 1985.

Dr. Rood filed this action in Macomb Circuit Court on December 29, 1987, claiming that his discharge violated his employment agreement, negligent evaluation, and breach of the covenant of good faith and fair dealing. On GDLS' motion,

Dr. Rood was incapable of performing both functions and cites two tasks assigned to Dr. Rood that were not accomplished. This is disputed by Dr. Rood.

[8] In his deposition, Dr. Rood testified that in September, 1984, he discovered that GDLS had hired Dr. Harper and that he asked Mr. Norman if he was being replaced. Mr. Norman allegedly informed Dr. Rood that he in fact was being replaced and that the decision was final and irrevocable. Mr. Norman did not, however, give Dr. Rood any reason for his termination at that time.

[9] Because Dr. Rood alleges that he was involuntarily terminated, for the purposes of this appeal, we will accept as true that he was discharged.

the circuit court dismissed plaintiff's negligent evaluation and breach of good-faith and fair-dealing claims for failure to state a claim on which relief can be granted. MCR 2.116(C)(8). Because Dr. Rood did not appeal this determination, the case proceeded through discovery on only the breach of implied contract claim.[10] Following discovery, GDLS filed a motion for summary judgment, which the trial court granted. Dr. Rood appealed in the Court of Appeals, which reversed in a split decision.[11] Unpublished opinion per curiam, decided December 27, 1990 (Docket No. 117470). GDLS filed an application for leave to appeal in this Court, which, in lieu of granting leave, remanded to the Court of Appeals for reconsideration in light of *Rowe.* 439 Mich 851 (1991). On remand, the Court of Appeals, in yet another split decision,[12] reversed its original holding. Unpublished opinion per curiam, decided February 19, 1992 (Docket No. 145598). We subsequently granted Dr. Rood's application for leave to appeal, 441 Mich 880 (1992), and we reverse.

II

Employment contracts for an indefinite[13] duration are presumptively terminable at the will of either party for any reason or for no reason at all. *Lynas v Maxwell Farms,* 279 Mich 684, 687; 273

---

[10] Because Dr. Rood failed to appeal these issues in the Court of Appeals, the issues are not properly before this Court.

[11] Judges CYNAR and BRENNAN signed the majority opinion, and Chief Judge DANHOF dissented.

[12] This time Judge GRIFFIN and Chief Judge DANHOF signed the majority opinion, with Judge BRENNAN dissenting.

[13] Employment contracts for a definite duration are presumptively terminable only for just cause. *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579, 611; 292 NW2d 880 (1980).

NW 315 (1937).[14] This presumption is not, however, "a substantive limitation on the enforceability of employment contracts but merely a rule of 'construction.' "[15] *Toussaint v Blue Cross & Blue Shield of Michigan,* 408 Mich 579, 597; 292 NW2d 880 (1980). "The presumption does not prevent proof of actual intent and should not be employed to permit unjustified evasions of promissory liability." *Rowe* at 676, n 14 (BOYLE, J., concurring).

To overcome the presumption of employment at will, a party must present sufficient proof either of a contractual provision for a definite term[16] of employment or a provision forbidding discharge absent just cause. *Rowe* at 636-637. Such provisions may become part of an employment contract as a result of "explicit" promises, Perritt, Employee Dismissal Law & Practice (2d ed), § 4.1, p 173, or promises implied in fact.[17] *Rowe* at 668 (BOYLE, J., concurring). As recognized in *Toussaint,* however, employer policies and procedures may also become a legally enforceable part of an employment relationship *if* such policies and procedures instill "legitimate expectations" of job secu-

[14] Contracts for "permanent" or "lifetime" employment are considered contracts for an indefinite duration and therefore presumptively terminable at the will of either party.

[15] As Justice BOYLE noted in her concurring opinion in *Rowe v Montgomery Ward & Co, supra* at 666-676, "the presumption of employment at will [is] a procedural device that, like other presumptions, is simply a legal recognition of the normal expectations of parties in most employment situations."

[16] See n 13.

[17] Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent. Just as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance. [1 Restatement Contracts, 2d, § 4, comment a, p 14.]

rity[18] in employees. *Toussaint* at 615.[19] In other words, there are two alternative theories of enforceability that may support a claim of wrongful discharge in Michigan. While the first theory is grounded solely on contract principles "relative to the employment setting," *Rowe* at 632, the second theory is grounded solely on public policy considerations. As Justice BOYLE noted in her concurring opinion in *In re Certified Question (Bankey v Storer Broadcasting Co)*, 432 Mich 438, 458; 443 NW2d 112 (1989), "the pure legitimate expectations leg of *Toussaint* was founded on the Court's common-law authority to recognize" enforceable obligations that arise " 'outside the operation of normal contract principles.' "

## A. "CONTRACT THEORY" OF *TOUSSAINT*

### 1. APPLICABLE LAW

Contractual liability is consensual. 1 Farnsworth, Contracts, § 3.1, p 160. A basic requirement of contract formation is that the parties mutually assent to be bound. *Id.* In *Rowe,* this Court recognized "the difficulty in verifying oral promises," *Rowe* at 641, especially in the employment relations context, because individuals often harbor "optimistic hope of a long relationship" that causes them to misinterpret their employer's oral statements as manifestations of an intention to undertake a commitment in the form of a promise of job security. *Rowe* at 640. Accordingly, and in

---

[18] In this context, we use the term "job security" as being synonymous with "just cause for discharge." See *Valentine v General American Credit, Inc,* 420 Mich 256, 258; 362 NW2d 628 (1984) ("The only right held in *Toussaint* to be enforceable was the right that arose out of the promise not to terminate except for cause").

[19] For convenience, we will refer throughout this opinion to the "express agreement" portion of the *Toussaint* decision as the "contract theory" and the "employee legitimate expectations" portion of the *Toussaint* decision as the "expectations theory."

an effort to recognize oral contracts for job security only where the circumstances suggest both parties intended to be bound, *id.* at 636, the *Rowe* Court held that "oral statements of job security must be clear and unequivocal to overcome the presumption of employment at will." *Id.* at 645.

In deciding whether a party has assented to a contract, we follow the objective theory of assent, focusing on how a reasonable person in the position of the promisee would have interpreted the promisor's statements or conduct. Calamari & Perillo, Contracts (3d ed), § 2-2, p 27. As Professor Farnsworth stated:

> Since it is difficult for a workable system of contract law to take account of assent unless there has been an overt expression of it, courts have required that assent to the formation of a contract be manifested in some way, by words or other conduct, if it is to be effective. [*Id.* at § 3.1, pp 160-161.]

Otherwise stated, to determine whether there was mutual assent to a contract, "we use an objective test, 'looking to the expressed words of the parties and their visible acts,'" *Rowe* at 640, quoting *Goldman v Century Ins Co,* 354 Mich 528, 535; 93 NW2d 240 (1958), and ask whether a reasonable person could have interpreted the words or conduct in the manner that is alleged. Thus, we begin our analysis by looking "to all the relevant circumstances surrounding the transaction, including all writings, oral statements, and other conduct by which the parties manifested their intent." *Rowe* at 641.

### (A) *SCHIPPERS*

#### (i) EVIDENCE

Viewed in a light most favorable to Mr. Schip-

pers, the relevant evidence is as follows: Mr. Schippers was employed at Sealed Power for approximately 12½ years before transferring to Hy-Lift. Before Mr. Schippers transferred to that division, Hy-Lift did not have a truck or a driver and relied totally on Sealed Power for its transportation needs.[20] In an effort to save money and to gain additional control over its transportation needs, Hy-Lift decided to lease a truck from Ryder and approached Mr. Schippers about his willingness to transfer from Sealed Power to Hy-Lift. Although Hy-Lift had its choice of Sealed Power drivers, it wanted Mr. Schippers because he had driven for Hy-Lift, knew the routes, and was considered the most reliable.

Mr. Schippers was one of seven drivers at Sealed Power, and he was second in seniority. Consequently, before deciding to make the switch to Hy-Lift, Mr. Schippers "consulted" with three of Hy-Lift supervisors, including his immediate supervisor, Mr. Bozik, and the general manager of Hy-Lift, Mr. Overway, about "job security." During these conversations, Roy Overway told him that "as far as he was concerned, unless something was really wrong, [Mr. Schippers] would be there for retirement" and that "Mr. Bosik [sic] went so far as to make the comment that as long as [Hy-Lift] had a truck, [he] would be the driver." Moreover, Mr. Schippers states that he was given "similar" assurances from another "management person" at Hy-Lift, Perry Abbes, although he was unable to recall his exact words.

At the time of transfer, SPX had issued an employee "Information Handbook." On page one, the handbook provides:

---

[20] Sealed Power had assigned Mr. Schippers to run the Hy-Lift route, and he had actually driven for Hy-Lift "on a daily basis" for three years before formally transferring to that division.

> We are proud of our people and recognize their
> value through steady employment, fair wages,
> good working conditions, unusually broad benefit
> programs, and recognition as individuals.
>
> Sealed Power has adopted overall policies of
> employment and standards of conduct which are
> *fair* to all employees and in the best interest of the
> company. *These policies and standards spell out
> your responsibilities to the company and the com-
> pany's responsibility and obligations to you.* [Em-
> phasis added.]

The handbook also provides that "[t]he company,
by its actions and attitudes, will endeavor to main-
tain a spirit of good will, loyalty and harmony
among all persons in the organization." In addi-
tion, the handbook provides for a sixty-day proba-
tionary period for "[a]ll newly hired employees"
and lists "prohibited" "practices," which *"may"*
result in "disciplinary action up to and including
discharge . . . ." One prohibited practice is "[i]n-
volvement in chargeable accidents . . . ." The list
of prohibited practices does not, however, purport
to be exhaustive: "There may be other instances
than those noted . . . where common sense will
indicate any necessary action that should be
taken."

"In [c]onclusion," the handbook contains the
following disclaimer:

> The contents of this manual are presented as a
> matter of information only. While Sealed Power
> believes wholeheartedly in the plans, policies and
> procedures described here, they are not conditions
> of employment. Sealed Power reserves the right to
> modify, revoke, suspend, terminate, or change any
> or all such plans, policies, or procedures, in whole
> or in part, at any time, with or without notice. The
> language used in this manual is not intended to
> create, nor is it to be construed a contract between
> Sealed Power and any one or all of its employees.

It also appears that there existed an informal management policy at Hy-Lift that purported to require "good reason" before terminating any employee.

(ii) ANALYSIS

SPX argues on appeal that the Court of Appeals failed to properly apply this Court's decision in *Rowe.* Specifically, SPX contends that the Court of Appeals erred in reversing the circuit court's grant of summary disposition upon finding that Mr. Schippers had failed to present sufficient evidence to overcome the presumption of employment at will. We agree.

The basis of Mr. Schippers claim of a contract implied in fact centers on certain oral statements made to Mr. Schippers during various conversations with Hy-Lift management before he transferred from Sealed Power to Hy-Lift. Mr. Schippers characterizes these conversations as specific negotiations regarding job security, and the oral statements of his supervisors as promises of termination only for just cause. We disagree.

When approached about formally transferring to Hy-Lift, Mr. Schippers expressed concern about Hy-Lift's commitment to maintaining its trucking operation to three of his supervisors, including the general manager of Hy-Lift, Roy Overway and his immediate supervisor, Mr. Bozik.[21] It was in this

---

[21] Mr. Schippers' deposition testimony provides in pertinent part:

I went in and I asked [Roy Overway] what the outlook was. You know, I had been running for them on a daily basis; but to transfer over and put it all in one spot, I wanted to . . .

*Q.* You were interested to know if they were going to continue to have work. Correct?

*A.* Correct. And he informed me at the time that they had their choice out of the seven drivers, and I was it; and, as far as

context that Mr. Overway told Mr. Schippers that "unless something really was wrong, [he] would be there for retirement," and Mr. Bozik stated that "as long as [we] have a truck, [you] would be the driver."[22]

Only by taking the statements completely out of context could a reasonable juror interpret them in the manner that Mr. Schippers asserts—as prom-

he was concerned, unless something was really wrong, I would be there for retirement.

\* \* \*

A. You know, Roy Overway made the statement in that meeting that, "Your direct supervisor is Larry Bosik [sic], and he is the only one that can cause you any problems, so you should talk to him, too," which I did.

According to Mr. Schippers:

A. Larry Bosik informed [him of] the same thing. They had their choice out of the seven drivers. They didn't want the other six.

Q. And what you were inquiring about was: Were they looking at shutdowns or what did they see in the future; was there going to be work there?

A. I was worried about the fact that I was Number 2 on the seniority list downtown, and I am moving into a division that has only one truck; "Are you going to keep it or are you all of a sudden, after a year, going to say, 'Well, we decided we don't need a truck?' "

Q. And the assurances that these people were giving you was that they expected to have work there. Right?

A. Yes. And Larry Bosik went so far as to make the comment that as long as they had a truck, I would be the driver.

[22] SPX does not deny that the statements were made. However, it does challenge Mr. Schippers' interpretation of the statements and alleges that he was at all times an employee at will. As stated in *Rowe* at 638:

[T]his is not a situation in which interpretation requires an express determination of credibility [but] [r]ather, this is a situation in which the parties attach different meanings to undisputed facts, and the Court is asked to conclude that the jury was entitled to determine from the conduct of the parties that a promise existed limiting the employer's ability to discharge.

ises to terminate "only if something was really wrong," i.e., for just cause. The record shows discussions concerning job security in the sense of Hy-Lift's resolve in maintaining its trucking function, but there is no evidence whatsoever that indicates that the parties even discussed job security in the sense of requiring just cause for Mr. Schippers' termination.[23]

The context in which the statements were made to Mr. Schippers is distinguishable from the context in which the statements were made to the plaintiff in *Toussaint.* Mr. Toussaint had several interviews with company representatives before being hired as an assistant to the company treasurer of Blue Cross & Blue Shield of Michigan (BCBSM). He was subsequently hired following an interview with the company treasurer, Mr. Allen R. Schaedel, in which Mr. Toussaint specifically inquired about job security:

---

[23] Mr. Schippers does not claim, sensibly we think, to have been promised an employment contract for a definite duration—for as long as Hy-Lift had a truck. To find such a contract, a reasonable jury must be able to conclude that a reasonable person in Mr. Schippers' position could have reasonably interpreted the statement not only as a manifestation of Hy-Lift's intention to give up its right to terminate Mr. Schippers at will, but also as a manifestation of intent to terminate his employment *only* if Hy-Lift ceased its trucking function. In other words, interpreted literally, it may appear that Hy-Lift promised Mr. Schippers that he would be the driver of the truck, regardless of continued licensure, insubordination, absenteeism, or even theft of company property. As Justice GRIFFIN wrote in *Bullock v Automobile Club of Michigan,* 432 Mich 472, 517; 444 NW2d 114 (1989) (concurring in part and dissenting in part):

> Surely, a modicum of realism and common sense is needed. An assurance such as that . . . simply cannot be separated from the realities of the working world.

Further, once the statement "unless something was really wrong" is viewed in context and properly interpreted to relate only to matters that may negatively influence either Hy-Lift's willingness or ability to continue its trucking operation, it becomes equally clear that Mr. Schippers was not offered employment subject to termination only when, and if, he reached the age of retirement.

"Mr. Schaedel had indicated to me that as long
as I did my job, that I would be with the company
[until retirement]; showed me a number of docu-
ments—I had asked the question about how secure
a job it was and he said that if I came to Blue
Cross, I wouldn't have to look for another job
because he knew of no one ever being *discharged.*"
[*Id.* at 640-641. Emphasis added.]

Unlike the facts of this case, both Mr. Toussaint's
inquiry and Mr. Schaedel's response indicate a
discussion concerning the likelihood of Mr. Tous-
saint being discharged. Here, the evidence indi-
cates that Mr. Schippers' only concern was losing
his job as a result of Hy-Lift discontinuing its
trucking function. Given that Mr. Schippers' in-
quiries were restricted to this subject, his super-
visors' statements simply cannot be interpreted as
assent to a contract providing for termination only
for just cause. See *Rowe* at 641. Indeed, viewing
the statements in context makes clear that the
language referred to management's intentions re-
garding the permanency of the trucking function
at Hy-Lift and not to the sufficiency of the grounds
required to terminate Mr. Schippers.

Despite the context in which the statements
were made, however, Mr. Schippers insists that his
interpretation of the statements was reasonable,
given the uniqueness of his position, the apparent
custom and practice of Hy-Lift to discharge only
for cause, and the written statements contained in
the employee "Information Handbook." Although
we might assume that a person who gives up
seniority by transferring from a division with six
other drivers might desire just-cause employment,
this is an insufficient basis on which to base a
finding of specific negotiations regarding such a

term.[24] Likewise, although it may be reasonable for an employer to offer a driver who is both reliable and familiar with its route just-cause employment to induce the relinquishment of seniority and to transfer to a division with only one truck, that possibility alone is insufficient to permit a reasonable inference that such an offer in fact was made. Nor does the apparent existence of an informal policy purporting to require "good reason"[25] to discharge provide sufficient objective support for Mr. Schippers' interpretation of the statements. The record does not indicate that Mr. Schippers was even aware of this policy. More importantly, however, it would be unreasonable to interpret the statements as objective manifestations of this in-

[24] In this regard, we would note that Mr. Schippers does not allege to have had a contract for just-cause employment at Sealed Power. As previously mentioned, his only concern about transferring to Hy-Lift was his loss of seniority. At Sealed Power, Mr. Schippers had a certain level of comfort in knowing that if the availability of work declined, or if Sealed Power decided to reduce the number of its trucks, then there were five other drivers that would be laid off before him. Hy-Lift's promise to retain its trucking function would, however, seem to have provided Mr. Schippers with virtually the same job security at Hy-Lift as he enjoyed at Sealed Power.

[25] Mr. Overway's deposition testimony provides in pertinent part:

*Q.* Do you feel that you can be terminated from Sealed Power for any reason?
*A.* For any reason?
*Q.* Yes.
*A.* No.
*Q.* Do you feel they have to give you a good reason?
*A.* Yes.
*Q.* Is that the custom and practice that you have seen?
*A.* Yes.
*Q.* And how long have you been there?
*A.* Since '61.
*Q.* Has that been the practice since '61?
*A.* To my knowledge.
*Q.* Is that the practice in Hy-Lift Division?
*A.* Yes, it is.

formal discharge policy, given the context in which the statements were made. Further, we reject Mr. Schippers' contention that the written statements contained in the employee "Information Handbook," provide objective support for his interpretation of his supervisors' statements. While the handbook may promise fairness and contain policies designed "to maintain a spirit of good will, loyalty and harmony among all persons in the organization," such promises and policies are not inconsistent with employment at will.

In sum, although there were discussions concerning job security in the sense of Hy-Lift retaining its trucking function, there is absolutely no evidence suggesting that the parties ever discussed job security in the sense of requiring just cause for Mr. Schippers' termination. As stated in *Rowe,* oral statements of job security, when viewed in light of surrounding circumstances, "must clearly permit a construction which supports the asserted meaning." *Rowe* at 641. Neither Mr. Overway's nor Mr. Bozik's statements, when viewed in context, evidence a clear intention on the part of Hy-Lift to create a contract to terminate Mr. Schippers only for cause. Consequently, viewing the evidence in a light most favorable to the plaintiff, we hold that there is simply insufficient evidence to permit a reasonable jury to find that a reasonable promisee would interpret the language or conduct of Mr. Schippers' supervisors as a promise forbidding discharge absent just cause. Viewed in context, the oral statements are insufficient to rise to the level of an agreement for just-cause employment.

## (B) *ROOD*

### (i) EVIDENCE

Viewing the evidence in a light most favorable to Dr. Rood, we find that sometime after Chrysler

sold the tank plant to GDLS, Dr. Rood had a conversation with GDLS' director of corporate health and safety, William Persky, regarding job security. During this conversation, Mr. Persky assured Dr. Rood that his "job is fine, it's secure." Further, Dr. Rood's immediate supervisor, Mr. Spiller, assured Dr. Rood that his job was secure and that he was "a key player" and "one of the basic components of the organization."

During Dr. Rood's employment, GDLS utilized what it called a "Performance and Career Evaluation Program." The stated purpose of this program was set out in a cover letter accompanying the instructions to the program, which provided:

> We, the people of [GDLS], are this company's greatest resource and most valuable asset.
>
> In recognition of this fact the leaders of GDLS are committed to enhance organizational and personal effectiveness, productivity, and operational efficiency by the on-going development of GDLS employees.
>
> To reach this goal we have designed a Performance Appraisal and Career Development format that involves you and your supervisor in a constructive dialog about your work performance and your work and career goals. It is the intent of this instruction booklet to briefly explain the procedure and the changes in the appraisal system.

Two "workbooks" accompanied this program: (1) a "Performance Evaluation Workbook," and (2) a "Career Expression Workbook." Completed annually, "[t]he Performance Evaluation Workbook is . . . a tool to help everyone involved reach an understanding of what is expected and how they are meeting those expectations." The "Career Expression Workbook," which is completed at the same time that an employee's performance is

rated, "is designed to clearly establish [the employ-ee's] long and short term career goals." The Career Expression Workbook asks employees to specify their long and short term career goals. Specifically, employees are asked to "[l]ist positions in the corporation that [they] feel presently qualified for or will be qualified for in the next 5 to 10 years," as well as "any job changes [they] feel are possible in the next 3 to 24 months." The workbook also asked employees to engage in a self analysis and to "[l]ist those areas in which [they] feel self-improvement is required to achieve [their] long [and short] term career goal." Lastly, the employee is asked to list areas in which they feel GDLS can "help [them] attain those goals." Once the workbook is completed, it is submitted to the employee's supervisor, and the supervisor is required to comment on "career entries and recommend[ ] steps to help [employees] attain [their] goals."

In April 1983, and again in April 1984, Dr. Rood received "above average" performance evaluations. While the first evaluation resulted in an "advancement potential" rating of "P,"[26] the second evaluation resulted in an "advancement potential" rating of "K."[27] The first evaluation was signed by Mr. Spiller and the second evaluation was confirmed by Donald Norman. In his 1983 Career Expression

[26] The second highest rating that an employee can receive, a "P" means " 'Potential' " and "assumes the individual . . . is qualified at present (or will likely be qualified in the foreseeable future) for a higher level position. It will not be given to individuals . . . whose technical qualifications for a higher level position are open to question."

[27] The third highest rating an employee can receive, a "K" means "Key Capability" and it is given to "an individual who, at the time of the appraisal, possesses a superior capability recognized division wide or corporate wide . . . . This individual is vitally important to the company due to unique experience in a particular professional capacity . . . [and] may have a greater opportunity to advance than an individual with" a rating of P or H.

Workbook, Dr. Rood expressed an interest in attaining the position of medical director, and his immediate supervisor, Mr. Spiller, confirmed his promotion potential, stating that "[Dr. Rood], in [his] judgement, is ready now." Again, in 1984, Dr. Rood expressed an interest in a medical director's position. This time, in confirming his promotion potential, Mr. Spiller wrote that he "[s]hould definitely be considered for the Director's job at Division level." Moreover, following each of the above performance evaluations, Dr. Rood was given a "merit increase." "Merit increases" are defined in the Corporate Industrial Relations Policy and Practice manual as follows:

A merit increase is an individual salary increase awarded in recognition of progressive performance improvement and prospects for future achievement. Merit increases are earned and are not to be awarded on the basis of length of service or by the lapse of time since the last increase or by other factors unrelated to performance.

In addition to the positive feedback that Dr. Rood was receiving, including verbal assurances of job security, two "above average" performance evaluations, and two "merit increases," Dr. Rood stresses a complete lack of negative feedback, concerning his performance. No one at GDLS had ever informed Dr. Rood of any performance related problems, although the "Performance Evaluation Workbook," provides:

An action plan *must* be developed for every employee evaluated as needing improvement to meet job requirements. A plan should also be developed for each employee meeting or exceeding job requirements but who could perform better. The plan should identify specific goals or objectives

to be achieved within a specific time period and indicate whether training, education or additional support or assistance from the supervisor would be helpful. Be specific enough so that both employee and supervisor know when the action plan has been accomplished. [Emphasis added.]

GDLS also promulgated and issued a "Guide to Good Conduct," which provides in pertinent part:

[GDLS] expects that the very highest standards of behavior and conduct will be observed by its employees. Employees are expected to conduct themselves while on Corporation time, business or premises in a manner that promotes the safety and welfare of employees, encourages congenial work habits, and protects personal and Corporation property. *Misconduct* may result in disciplinary action ranging from reprimand to discharge. Some examples of misconduct, *which are not all inclusive,* are listed below. [Emphasis added.]

There are thirty-one examples of "misconduct" listed in the guide and there is no mention of employment at will.

Lastly, GDLS promulgated and issued an "Industrial Relations" policy and procedure guide, containing "Standard Practice 2-415" (SP 2-415), which was "[a]pplicable to all Management and Management Support employees who are to be affected by a reduction in the workforce or circumstances which dictate involuntary termination." The stated purpose of this standard practice was "[t]o establish a uniform method of coordinating and effecting the layoff or involuntary termination of Management and Management Support employees." SP 2-415 defined "layoffs" and "Involuntary Terminations," in the "Definitions" section as follows:

[(1)] *Layoff* [:] A separation of known or indefinite duration initiated by the Division because of a required or desired reduction in the workforce.

[(2)] *Involuntary Termination*[:] Discharge for reasons of *misconduct* or *unacceptable performance.* [Emphasis added.]

SP 2-415 also provided:

V.B. *Involuntary Terminations*

1. The highest level review of events leading to a Management or Management Support involuntary termination is essential before taking action.

a. When a decision to terminate is being considered, all relevant information is reviewed at the following successive levels:

1) Cognizant Manager/Director with the local Industrial Relations Manager.

2) Local Industrial Relations Manager with the Plant Manager at manufacturing locations.

3) Division Vice President—Industrial Relations or his designated representative with the appropriate functional Division Vice President(s)/Program Director(s).

4) Division Vice President—Industrial Relations with the General Counsel and with the Vice President and General Manager.

Under the "Procedure" section, SP 2-415 further provides:

B. *Involuntary Terminations*

1. When all events leading to a decision to terminate and all information which may be generated during an investigative phase is reviewed in accordance with Section V.B.1. of this Standard Practice, the Director—Personnel Relations advises the cognizant functional Division Vice President(s)/Program Director(s) and Industrial Relations Manager of the decision and reviews the arrangements for actually implementing the required personnel action.

2. The Industrial Relations representative in attendance when termination action is taken summarizes the event in writing for the record and forwards a copy to the Director—Personnel Relations for retention and distribution as deemed appropriate.

According to Mr. Norman, a standard practice is an official statement of formal corporate policy. There were no other definitions of involuntary termination ever issued, there are no disclaimers indicating that any of the distributed materials were not to be construed as employment contracts, and there is no mention in any of the distributed materials of employment at will. This policy became effective on January 12, 1984. It is undisputed that Dr. Rood fell within this group of employees.

Five months after receiving a "K" performance rating, Dr. Rood was forced to resign to make way for Dr. Richard Harper. In his first amended complaint, Dr. Rood alleged that his termination breached his employment contract that provided for termination only for just cause.

(ii) ANALYSIS

Dr. Rood argues on appeal that the Court of Appeals erred in ruling that his claim of breach of implied contract, providing for termination only for just cause, was insufficient as a matter of law. We disagree.

Dr. Rood does not contend that GDLS explicitly promised him either just-cause employment or that his position would never be eliminated. Nevertheless, he asserts that the oral statements of Mr. Persky and Mr. Spiller, when coupled with GDLS' published policies and procedures and his favorable evaluations and merit pay increases,

gave rise to a just-cause employment contract implied in fact, providing that his job was secure absent a layoff, misconduct, or unacceptable performance. We disagree.

Shortly after GDLS acquired the Detroit tank plant, Dr. Rood became aware of a "paper circulating around," which appeared to be part of a company document. Contained in this paper was a statement "to the effect that the nurses were secure, [but] that the doctor was questionable or undecided." Interpreting the paper to reflect GDLS' intention with regard to the disposition of employees of the newly acquired company, Dr. Rood became concerned. Consequently, he confronted Mr. Persky about the comment in the paper and was told that it had nothing to do with his job, that his "job [was] fine, it's secure."

A reasonable juror simply could not find that a reasonable employee in Dr. Rood's position would have interpreted the statement "[y]our job is fine, it's secure," in context, as a promise of just-cause employment. The statement was made in response to an inquiry about whether GDLS had the present intention to eliminate certain employees following the acquisition of the Detroit tank plant, and not in response to an inquiry concerning when or how Dr. Rood's employment might otherwise be terminated. Indeed, when asked whether Mr. Persky had ever told him at this meeting that he would be discharged only for just cause, Dr. Rood stated: "I don't think the subject came up."

Mr. Spiller's statements to Dr. Rood that his "job [was] secure" and that he was "a key player" and "one of the basic components of the organization" are likewise insufficient to permit a reasonable juror to find that a reasonable promisee would interpret these statements as a promise of just-cause employment. The statements were made

at one of Dr. Rood's performance evaluations and again when Dr. Rood was asked to attend a board of directors meeting being held in Detroit. When asked whether Mr. Spiller ever told him during these meetings or any subsequent meetings that he would only be discharged for good or just cause, Dr. Rood stated: "I don't think the subject of discharge came up." A reasonable employee could not interpret an employer's statements, such as these, which merely commend an employee's performance, as promises of job security, *MCI Telecommunications Corp v Wanzer*, 897 F2d 703, 707 (CA 4, 1990) (applying Virginia law). Nor could a reasonable employee interpret a statement that follows a positive evaluation to the affect that your "job is secure" as an intent to enter a just-cause employment contract with that employee. As stated in *Wanzer* at 707, such statements

> only infer[ ] that [the employee] was doing a good job and that those around him could not envision a person of that merit being fired. It does not create a factual issue over the status of his employment relationship.

Lastly, although we find in part B(2)(b) that GDLS' written policies and procedures could reasonably give rise to legitimate expectation of just-cause employment, we do not find that these policies and procedures evidence a clear intention on the part of GDLS to create a *contractual* just-cause employment relationship with *all* of its management employees. As stated in *Bankey* at 455-456:

> It is one thing to expect that a discharge-for-cause policy will be uniformly applied while it is in effect; it is quite a different proposition to expect that such a personnel policy, having no fixed duration, will be immutable . . . . The very

definition of "policy" negates a legitimate expectation of permanence. . . . In other words, a "policy" is commonly understood to be a flexible framework for operational guidance, not a perpetually binding contractual obligation.

We do not mean to suggest that the provisions contained in employee handbooks can never become a part of an employment contract. *Toussaint,* of course, held otherwise. See *id.* at 613. This case is, however, distinguishable from *Toussaint.* Mr. Toussaint was given his BCBSM employee manual following a specific inquiry about the likelihood of his being discharged. This fact provided objective evidence to support an inference that the parties intended the handbook provisions, setting forth BCBSM's discharge-for-cause policy, to become a part of Mr. Toussaint's employment contract. See *Rowe* at 641. In this case, there is no evidence in the record to suggest that Dr. Rood received his handbooks in such a manner. Indeed, it appears that he received the handbooks in exactly the same way as all other GDLS management employees.

In such circumstances, our inquiry is not limited to the question whether the employer sufficiently manifested an intention to enter a single contractual just-cause employment relationship with the party before the Court, but, rather whether the employer has sufficiently manifested an intention to enter such a relationship with all employees subject to the relevant policies and practices.[28] Otherwise stated, a finding that the employee policy of discharge for cause contained in the GDLS employee handbooks became a part of Dr. Rood's employment contract would necessarily constitute

---

[28] In these cases, of course, the "uniqueness" of the individual plaintiff's position is irrelevant.

a finding that it became a part of the employment contract of every manager who had been employed at GDLS when the handbooks were in effect. Such a commitment should not be lightly inferred. Accordingly, we hold that where an employer establishes a policy of discharge for cause, it may become part of an employment contract only when the circumstances (e.g., the language in the handbook itself, or an employer's oral statements or conduct) clearly and unambiguously indicate that the parties so intended. In this case, there is no evidence, other than the mere promulgation and dissemination of the employee handbook that merely implies a discharge for cause policy, from which a reasonable juror could infer that GDLS manifested an intention to enter a "perpetually binding contractual obligation" with *all* of its management employees. Such evidence is insufficient as a matter of law. To hold otherwise, would deter the socially desirable and commercially beneficial use of employee handbooks.

## B. "LEGITIMATE EXPECTATIONS THEORY" OF *TOUSSAINT*

### 1. APPLICABLE LAW

As noted above, the legitimate expectations theory of *Toussaint* is not based on traditional contract analysis.[29] The rationale for judicial enforcement of employer policies and procedures relating to employee discharge is simply the intuitive recognition that such policies and procedures tend to enhance the employment relationship and encour-

---

[29] No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. [*Toussaint* at 613.]

age an "orderly, cooperative and loyal work force" *Toussaint* at 613, for the ultimate benefit of the employer.[30] In short, in addition to the traditional grounds for enforcing promises, this perceived employer benefit is recognized under *Toussaint* as a sufficient, and independent, basis for enforcing promises of job security contained in employer policy statements that are disseminated either "to the work force in general or to specific classifications of the work force, rather than to an individual employee."[31] *Bankey* at 443, n 3. As stated in *Toussaint,* "[h]aving announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory." *Toussaint* at 619.

The first step in analyzing a legitimate expectations claim under *Toussaint,* is to determine, *what,* if anything, the employer has promised. Promises, like contracts, may be either express or implied. See n 17. The Second Restatement of Contracts, § 2(1), defines a "[p]romise" as "a manifestation of

---

[30] Paraphrasing *Toussaint,* we stated in *Bankey* at 454:

[A]n employer who chooses to establish desirable personnel policies, such as a discharge-for-cause employment policy, is not seeking to induce each individual employee to show up for work day after day, but rather is seeking to promote an environment conducive to collective productivity. The benefit to the employer of promoting such an environment, rather than the traditional contract-forming mechanisms of mutual assent or individual detrimental reliance, gives rise to a situation "instinct with an obligation."

[31] The legitimate expectations exception is therefore inappropriate where desirable policies and procedures are applicable only to an individual employee. The whole rationale underlying legal enforcement of such policies and procedures absent consideration or individual detrimental reliance is the idea that other employees are likely aware of the policies and procedures and that the employer benefit is realized overall.

intention to act or refrain from acting in a *specified way,* so made as to justify a promisee in understanding that a commitment has been made." (Emphasis added.) As is readily apparent, not all policy statements will rise to the level of a promise. For instance, an employer's policy to act or refrain from acting in a specified way *if* the employer chooses is not a promise at all. Also apparent in the definition of a promise is the need for specificity. The more indefinite the terms, the less likely it is that a promise has been made. And, if no promise is made, there is nothing to enforce.

Once it is determined that a promise has been made, the second step is to determine whether the promise is reasonably capable of instilling a legitimate expectation of just-cause employment in the employer's employees. In this regard, we note that only policies and procedures reasonably related to employee termination are capable of instilling such expectations.

The proper disposition of these cases requires a discussion of our decisions in *Toussaint* and *Renny v Port Huron Hosp,* 427 Mich 415; 398 NW2d 327 (1986). In *Toussaint,* this Court held that a reasonable juror could find that a reasonable employee could interpret the employee handbook there involved as the employer's commitment to discharge employees covered by the handbook for just cause only. The employee handbook contained an *express* statement of company policy, providing that BCBSM would "release employees for just cause only," *id.* at 656, along with elaborate and specific disciplinary procedures leading up to and including discharge. *Id.* at 651-655. In *Renny,* this Court also found that the employee handbook was reasonably capable of instilling legitimate expectations of just-cause employment in the employer's

employees. Although the employee handbook in
*Renny* did not contain an express discharge-for-
cause-only policy statement as did the handbook in
*Toussaint,* it did provide a specific list of discipli-
nary violations and the penalties for each along
with an optional grievance procedure. *Renny* at
430-431. Of particular significance to this Court in
*Renny* was the statement contained in the "Man-
agement Rights" section of the employee hand-
book, which provided that, although the employer
retained the exclusive right to discharge employ-
ees, that right was *expressly* made "subject . . . to
the regulations and restrictions outlined in th[e]
Employee Handbook." *Renny* at 427. In neither
*Toussaint* nor *Renny* did the employee handbook
contain a statement expressly retaining the em-
ployer's common-law right to terminate employees
at will.

The common thread running through our deci-
sions in *Toussaint* and *Renny* is the presence of
clear and specific employer policy statements, re-
garding employee discharge. Otherwise stated, the
handbooks in both *Toussaint* and *Renny* contained
statements reasonably capable of being interpreted
as promises to discharge only for just cause. Con-
sistent with *Toussaint* and *Renny,* we therefore
hold that, in all claims brought under the legiti-
mate expectations theory of *Toussaint,* the trial
court should examine employer policy statements,
concerning employee discharge, if any, to deter-
mine, as a threshold matter, whether such policies
are reasonably capable of being interpreted as
promises of just-cause employment. If the em-
ployer policies are incapable of such interpreta-
tion, then the court should dismiss the plaintiff's
complaint on defendant's motion for summary
disposition. MCR 2.116(C)(10). If, however, the em-
ployer's policies relating to employee discharge are

capable of two reasonable interpretations, the issue is for the jury. With these principles in mind, we now turn to the cases at hand.

### 2. ANALYSIS

### (A) *SCHIPPERS*

Applying these principles, we are convinced that a reasonable juror could not find that the SPX's handbook gave rise to legitimate expectations of just-cause employment. The handbook contains no mandatory provisions or specific procedures, regarding employee discharge. Although it purports to adopt "overall policies of employment and standards of conduct which are fair to all employees," such statements are insufficient to permit a reasonable inference that SPX intended to give up its right to discharge employees at will. A promise of fairness, without more, is too vague to judicially enforce.

The probationary period for newly hired employees is likewise insufficient to overcome the presumption of employment at will. The SPX probationary period has nothing to do with employee discharge but, rather merely marks the time when new employees are eligible for other company benefits, including seniority, paid holidays, and eligibility for vacation and military leave. See *Johnston v Panhandle Cooperative Ass'n,* 225 Neb 732, 740-741; 408 NW2d 261 (1987). Nor does the work performance section of the handbook relate to or in any way promise continued employment. Rather, this section merely informs employees that, in exchange for satisfactory work performance, SPX will provide "good working conditions, an excellent security program and pay wage rates that compare favorably with area practices for similar work." It is clear that the "security pro-

gram" mentioned in the "Work Performance" section of the handbook is the "Your Personal Security Program" section that concerns employee benefits, such as health and accident insurance, family death benefits, and pension plan. Lastly, although the "Standard Shop Rules and Regulations" do provide examples of conduct that may result in discipline "up to and including discharge," the list does not purport to be all inclusive. A nonexclusive list of common-sense rules of behavior that can lead to *disciplinary action or discharge,* clearly reserves the right of an employer to discharge an employee at will. *Bauer v American Freight System, Inc,* 422 NW2d 435, 438 (SD, 1988).

Because the policies expressed in the handbook cannot reasonably be interpreted as a promise on the part of spx to limit its right to terminate its employees at will, it is immaterial whether Mr. Schippers' accident was chargeable or nonchargeable. Spx retained the right to terminate his employment for any reason or for no reason at all. Because we find that a reasonable juror could not find that the policies contained in the spx employee handbook would instill legitimate expectations of just-cause employment, we need not reach the question whether a disclaimer of intent to create contractual liability contained in an employee handbook is sufficient to disclaim liability under the legitimate expectations theory of *Toussaint.*

### (B) *ROOD*

We cannot find that the GDLS Guide to Good Conduct, alone, is. reasonably capable of being interpreted as a promise that only "misconduct" will result in discharge. *Bauer* at 438. Nor can we find that either the annual employee evaluation

policy,[32] or the policy related to merit pay increases,[33] individually, are reasonably capable of such an interpretation. But when all of the GDLS policies are considered together with SP 2-415, we believe that a reasonable juror could find that the overall employee policies could reasonably instill a legitimate expectation of just-cause employment in GDLS management and management support personnel.

SP 2-415 clearly states that its purpose is "[t]o establish a uniform method of coordinating and effecting the layoff or involuntary termination of Management and Management Support employees." The phrase "involuntary termination" is specifically defined, as "[d]ischarge for *reasons of misconduct* or *unacceptable performance.*" Further, SP 2-415 purports to require "[t]he highest level review of events leading to a Management or Management Support involuntary termination . . . *before* taking action." (Emphasis added.) These statements are sufficiently clear to warrant a reasonable employee to expect that the company had elected, at least temporarily, to limit its involuntary termination discretion with respect to management and management support personnel to misconduct or unacceptable performance.[34]

---

[32] *Kay v United Technologies Corp,* 757 F2d 100, 101-102 (CA 6, 1985); *Hopes v Black Hills Power & Light Co,* 386 NW2d 490, 491 (SD, 1986).

[33] *Dipietro v Jefferson Bank,* 123 Lab L Rep (CCH), ¶ 57,093 (1992).

[34] GDLS argues that the SP 2-415 "does nothing more than outline an informational *procedure* used to notify management personnel of layoffs and terminations." At oral argument, counsel for GDLS stated that SP 2-415 was intended only to provide a means by which the company would notify all management personnel when it was going to terminate certain people under certain conditions. In other words, GDLS contends that the reporting requirement is inapplicable unless a manager or management support employee is discharged for misconduct or unacceptable performance. For instance, if a manager was terminated because of a personality conflict with a superior, there would be no reporting requirement because the manager was not

As stated in *Valentine v General American Credit, Inc,* 420 Mich 256, 258; 362 NW2d 628 (1984), "[e]mployers and employees remain free to provide, or not to provide, for job security." Employers also remain free to establish, or not to establish, personnel policies and procedures. In *Toussaint* at 619, we noted that "[a]n employer who establishes no personnel policies instills no reasonable expectations" of just-cause employment in its employees. Nevertheless, if an employer elects to create policies and procedures that are reasonably capable of being interpreted as promises to refrain from discharging employees absent just cause, it is for the jury to determine whether such policies and procedures instilled a legitimate expectation of just-cause employment.[35]

### CONCLUSION

There are two alternative theories of enforceability that may support a claim for wrongful discharge in Michigan: (1) contract, and (2) public policy. We find that neither plaintiff provided sufficient evidence to overcome the presumption of employment at will under the contract theory. We

dismissed because of misconduct or unacceptable performance. Whether a reasonable employee would interpret SP 2-415 as merely a notification procedure used to report layoffs and involuntary terminations that arise only as a result of misconduct or unacceptable performance to management or whether a reasonable employee would interpret SP 2-415 as assuring management and management support personnel that they would be involuntarily terminated only for misconduct or unacceptable performance is, on these facts, a jury question. "Where there are two fairly reasonable interpretations of the situation . . . , summary disposition is inappropriate." *Rowe* at 636, n 5.

[35] GDLS alleges that the reason for Dr. Rood's discharge was economic necessity. This reason, however, is challenged by Dr. Rood. Therefore, whether economic necessity was the true reason for Dr. Rood's discharge or whether it was a pretext is also a question for the jury. *Toussaint* at 622.

do find, however, that a reasonable jury could find that GDLS' written policies and procedures could have instilled a legitimate expectation of just-cause employment in plaintiff Rood. Accordingly, we reverse the judgments of the different panels of the Court of Appeals, and we remand *Rood* to the trial court for further proceedings consistent with this opinion.

BRICKLEY, BOYLE, RILEY, GRIFFIN, and MALLETT, JJ., concurred with CAVANAGH, C.J.

LEVIN, J. (*concurring in part and dissenting in part*). I concur with the majority's conclusion that Richard Rood presented sufficient evidence to withstand General Dynamics' motion for summary disposition under what the majority terms "the legitimate expectations theory of *Toussaint [v Blue Cross & Blue Shield of Michigan,* 408 Mich 579; 292 NW2d 880 (1980)],*" ante,* p 137. I write separately because Rood also presented sufficient evidence to withstand summary disposition under the "contract theory of *Toussaint*" and also because Joseph Schippers presented sufficient evidence to withstand summary disposition under both prongs of *Toussaint.*

The issue presented is whether, considering the evidence in a light most favorable to Rood and Schippers, there is any question of material fact for presentation to the jury concerning the nature of the employment relationship. It appears on review of the records that there is a material question of fact whether a just-cause employment relationship existed between the parties. I would therefore reverse the judgment of the Court of Appeals in *Rood,* affirm the judgment of the Court of Appeals in *Schippers,* and remand both cases for trial.

I

Schippers relies on three categories of evidence to substantiate his claim that a just-cause employment relationship existed between him and spx: the Sealed Power employee handbook, the custom and practice of Hy-Lift regarding employee discharge, and oral assurances by his supervisors at Hy-Lift regarding "job security."

Spx's employee "Information Handbook" provides:

> We are proud of our people and recognize their value through steady employment, fair wages, good working conditions, unusually broad benefit programs, and recognition as individuals.
> Sealed Power has adopted overall policies of employment and standards of conduct which are fair to all employees and in the best interest of the company. These policies and standards spell out your responsibilities to the company and the company's responsibility and obligations to you.

The handbook also contains the following disclaimer:

> The contents of this manual are presented as a matter of information only. While Sealed Power believes wholeheartedly in the plans, policies and procedures described here, they are not conditions of employment. Sealed Power reserves the right to modify, revoke, suspend, terminate, or change any or all such plans, policies, or procedures, in whole or in part, at any time, with or without notice. The language used in this manual is not intended to create, nor is it to be construed a contract between Sealed Power and any one or all of its employees.

The handbook provides further that "The company, by its actions and attitudes, will endeavor to

maintain a spirit of good will, loyalty and harmony among all persons in the organization." Finally, the handbook establishes a sixty-day probation period and a list of shop rules and regulations.

Schippers also presented the deposition testimony of Roy Overway, the general manager of the Hy-Lift division, that—at least since 1961 when Overway began working for the company—it was the custom and practice of the Hy-Lift division to discharge employees only for cause.

Schippers testified on deposition to oral assurances regarding job security made to him while he was considering whether to transfer from SPX's Sealed Power division to its Hy-Lift division. As noted by the majority, Schippers was concerned whether Hy-Lift—which had previously contracted its trucking operations—was committed to maintaining its own trucking operation. He made inquiries about "job security" before accepting the transfer. According to his deposition testimony, he was assured by Roy Overway, in response to these inquiries, that "unless something was really wrong, [he] would be there for retirement." Similarly, Schippers testified that his direct supervisor, Larry Bozik told him that "as long as they had a truck, I would be the driver."

The majority finds that "a reasonable juror could not find that the SPX's handbook [probationary period or shop rules and regulations] gave rise to legitimate expectations of just-cause employment." *Ante,* p 141. At the risk of appearing unreasonable, I conclude that, reasonable minds can differ whether the provisions of the handbook, the probationary period, the shop rules and regulations, and the custom and practice of Hy-Lift to terminate only for cause, considered individually or together, create a reasonable expectation of

termination only for cause under the contract theory of *Toussaint.* Summary disposition of this claim is inappropriate.

The majority also disagrees with Schippers' characterization of the oral assurances made to him regarding job security with Hy-Lift. According to the majority, these statements only meant that Hy-Lift was resolved to maintain its trucking function, and, therefore, no reasonable juror could interpret these statements as promises to terminate Schippers " 'only if something was really wrong,' i.e., for just cause." *Ante,* p 124. Again, I disagree. Whether these statements of assurance regarding Schippers job security created a reasonable expectation of just-cause employment under the legitimate expectation prong of *Toussaint* is a question of fact on which reasonable minds could differ. Therefore, it is properly for the jury.

II

The majority finds that General Dynamics' Guide to Good Conduct, annual employee evaluation policy, merit pay increase policy, and Standard Practice 2-415, taken together, would allow "a reasonable juror [to] find that the overall employee policies could reasonably instill a legitimate expectation of just-cause employment in GDLS management and management support personnel." *Ante,* p 143. I agree.

In addition, however, Dr. Rood asserts that oral representations he received, coupled with GDLS' policies and procedures and his favorable evaluations[1] and merit pay increases, gave rise to an implied just-cause employment contract under the

[1] As noted by the majority, Dr. Rood consistently received good evaluations and his promotional potential was well rated. He received no negative feedback.

contract theory of *Toussaint.* The first such assurance was given to Rood by William Persky, GDLS' director of corporate health and safety, during a discussion regarding job security,[2] that his "job is fine, it's secure." Similarly, Rood's immediate supervisor, Mr. Spiller, assured him that his job was secure and that he was "a key player" and "one of the basic components of the organization."

The majority concludes:

> A reasonable juror simply could not find that a reasonable employee in Dr. Rood's position would have interpreted the statement "[y]our job is fine, it's secure," in context, as a promise of just-cause employment. . . .
>
> Mr. Spiller's statements to Dr. Rood that his "job [was] secure" and that he was "a key player" and "one of the basic components of the organization" are likewise insufficient to permit a reasonable juror to find that a reasonable promisee would interpret these statements as a promise of just-cause employment. [*Ante,* p 134.]

I conclude, however, that, considered with the policies and procedures of the company, which the majority finds to be sufficient to sustain a claim under the legitimate expectations prong of *Toussaint,* the assurances given to Rood are sufficient to create a question of fact whether a just-cause employment relationship existed between Rood and General Dynamics under the contract theory prong of *Toussaint.*

III

In sum, the evidence presented by Rood and

[2] Dr. Rood was the plant physician at Chrysler's tank plant at the time it was sold to General Dynamics Land Systems division. After the plant was sold, Dr. Rood was concerned about his status with the new company and began to inquire concerning job security.

Schippers is sufficient to create a question of material fact for the jury whether oral assurances, written company policies, and company procedures and practices gave rise to a contract of just-cause employment under either prong of *Toussaint*. It cannot properly be said that all reasonable persons would agree that no such contract was created between the parties.

I would reverse the judgment of the Court of Appeals in *Rood* and affirm in *Schippers,* and remand both cases for trial.