107 F.3d 12
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James Richard WILSON, Plaintiff-Appellant,
v.
WELLS ALUMINUM CORP., Defendant-Appellee.
 No. 95-2003.
 United States Court of Appeals, Sixth Circuit.
 Feb. 07, 1997.
 
 Before: KRUPANSKY, BOGGS, and SILER, Circuit Judges.
 BOGGS, Circuit Judge.
 
 
 1
 James Richard ("J.R." or "Dick") Wilson, a human resources administrator, worked from 1974 to 1985 at a Rome, New York, facility of Revere Copper & Brass, parent of defendant Wells Aluminum Corporation ("WAC"). In July 1985, WAC recruited Wilson for a job at its plant in Kalamazoo, where he worked until WAC terminated him, along with six other employees, in February 1994. Wilson was 58 when WAC fired him, and was an insulin-dependent diabetic. He brought this action in Michigan state court, alleging wrongful discharge, employment discrimination (on account of his age) in violation of the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), and disability discrimination in violation of the Michigan Handicappers' Civil Rights Act ("HCRA"). WAC removed to federal district court. The district court granted WAC's motion for summary judgment on all counts, and Wilson now appeals. We affirm.
 
 
 2
 * Conversations that occurred at the time of Wilson's hiring by WAC and periodically over the course of his employment there underpin his wrongful discharge claim.
 
 
 3
 Wilson alleges that during negotiations leading to his transfer to WAC, the company's vice-president and general manager, Larry Nyberg, made representations as to the job security Wilson would enjoy at the WAC plant. Wilson's deposition testimony included the following passages:
 
 
 4
 [Nyberg] assured me that he needed me. He referred to me, his nickname was "Big Guy." I need you. You have done a good job for me. You come out and I'll take care of you.
 
 
 5
 * * *
 
 
 6
 [Nyberg and his wife] continued to urge me to come to Kalamazoo. It was serious for me because my wife would have to give up her job. I had a home. He assured me that ... I would not lose anything if I came out, that I had a job and I would have a job for a long time. That the only way I would lose it was if I did something major wrong.
 
 
 7
 * * *
 
 
 8
 Q. Did you and [Nyberg] discuss what was meant by a long time?
 
 
 9
 A. In terms of years?
 
 
 10
 Q. Yeah.
 
 
 11
 A. I took it to mean until I retired.
 
 
 12
 Wilson offered no notes or documentation to support his recollections. Nyberg confirmed the general circumstances surrounding his negotiations with Wilson, but denied offering him a job for life, permanently, or for any particular length of time, or from which he could be discharged only for just cause. No written employment contract accompanied Wilson's acceptance of WAC's offer. Wilson stated that no company documentation existed to reflect those representations, because at WAC "most of that ... would have been done by word. Larry's word was his bond."
 
 
 13
 Wilson also testified that in ensuing years he heard representations made by WAC managers to their managerial subordinates that they "would have a job forever pretty much as long as [they] kept [their] nose[s] clean." Wilson submitted affidavits from Bob Roberts and Thomas Fulton, respectively the operations manager and production/plant manager at the Kalamazoo plant for periods between 1987 and 1994.[1] Roberts stated:
 
 
 14
 [T]he termination policy for the non-hourly employees was to discharge for cause only. Mr. Wilson was aware of this policy and ... relied on this policy and administered it. I administered it as well and all of the supervisors who reported to me were aware of this policy and were told to implement it.
 
 Fulton stated:
 
 15
 WAC Aluminum had a policy and practice of not terminating individuals except for cause.[2] This policy was implemented by me in my function as a production/plant manager.
 
 
 16
 Nyberg's testimony on the issue of a just-cause policy was self-contradictory. His answers to questions posed by Wilson's counsel tended to confirm the existence of such a policy, but in answering questions from WAC's counsel, he denied it.
 
 
 17
 No employment handbook for management employees or other written statement of these alleged policies and practices appears in the record; the source of any such policy was not so definite as that. Wilson stated in his deposition that "I don't know of any written [just-cause] policy that I had in my possession. Any feelings have always been by the statements and practices as shown by upper management within the Wells hierarchy and generally would be verbalized by the people within the company."
 
 II
 
 18
 The district court correctly identified two possible theories by which Wilson could sustain a claim of wrongful discharge under Michigan law: contract and legitimate expectations. See Rood v. General Dynamics Corp., 507 N.W.2d 591, 597-98 (Mich.1993).
 
 
 19
 A. Contract.
 
 
 20
 The district court easily and correctly disposed of the claim in contract. The court noted that employment contracts in Michigan are presumptively at will, but that the presumption can be overcome by presenting sufficient proof either of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause. See Rood, 507 N.W.2d at 597. Because of the difficulty of verifying oral promises, "oral statements of job security must be clear and unequivocal to overcome the presumption of employment at will." Id. at 598, quoting Rowe v. Montgomery Ward & Co., 473 N.W.2d 268, 275 (1991).
 
 
 21
 Nyberg's statements to Wilson as Wilson described them ("You come out and I'll take care of you;" Wilson would have a job for "a long time;" would lose it only if he did "something major wrong") were far from "clear and unequivocal" statements. (Exactly what does it mean to "take care" of someone? How much time is a "long time?" What is a "major wrong?")
 
 
 22
 The district court therefore correctly concluded that if the wrongful discharge claim turned on the existence of an oral contract, WAC would be entitled to summary judgment on that count.
 
 
 23
 B. Legitimate Expectations.
 
 
 24
 First announced by the Michigan Supreme Court in Toussaint v. Blue Cross & Blue Shield of Michigan, 292 N.W.2d 880 (Mich.1980), the principle that "employer policies and practices may also become a legally enforceable part of an employment relationship if [they] instill 'legitimate expectations' of job security in employees" is not a contractual doctrine, but one "grounded solely on public policy considerations." Rood, 507 N.W.2d at 598. The doctrine is based on "the intuitive recognition that such policies and procedures tend to enhance the employment relationship and encourage an 'orderly, cooperative and loyal work force' for the ultimate benefit of the employer." Id. at 606 (internal citation omitted).
 
 
 25
 The district court rejected Wilson's claim that he had a legitimate expectation not to be discharged without just cause. We do not find it necessary either to affirm or reject the court's analysis on that score, because even if we were to reverse the district court on this point, WAC would still have a dispositive defense.
 
 
 26
 WAC asserts that it terminated Wilson and his six colleagues for economic reasons. "[B]ona fide economic reasons for discharge constitute 'just cause' under Toussaint." McCart v. J. Walter Thompson USA, Inc., 469 N.W.2d 284, 287 (Mich.1991). Robert Cecil, manager of the Kalamazoo plant, provided the chief evidence to support this assertion. In a deposition, he stated that when he was hired by WAC in October 1993, "there was no question in my mind that I was expected to improve profitability at the Kalamazoo plant.... They were looking for more profitability. They said the plant is capable of producing a larger profit than it's currently doing." Cecil testified that he drew up a reorganization plan under which he terminated seven managerial employees. Cecil Aff., JA at 158. Cecil testified that the terminations resulted in savings to WAC of $200,000 to $250,000 in salary costs, plus employer share of federal taxes and benefits. A list of six laid-off employees and the employees who assumed their duties shows that all duties were absorbed by existing WAC employees. However, Wilson's successor, John Smail, also left WAC within a matter of months, and was replaced by a fresh hire, Belden.
 
 
 27
 To counter WAC's economic-reason defense, Wilson submits an affidavit from Kathy Yarian, who at the time of Wilson's termination worked at an employment agency that helped recruit employees for WAC. Yarian stated that in the period from December 1993 to March 1994 "and thereafter" WAC utilized her agency for hiring both production workers "as well as workers in administrative or skilled positions, intending that such become permanent workers."
 
 
 28
 Yarian's affidavit fails to counter Cecil's testimony as to the existence of good economic reasons for the lay-offs, including Wilson's. She does not provide information as to whether any of the "administrative or skilled" employees hired through her agency were intended to replace Wilson or the others who were fired at the same time. Nor did the hiring of production workers undermine the validity of measures to reduce managerial overhead. Even if the company's business were booming, that would not make simultaneous cost-control measures any less legitimate. A company need not be on the ropes in order to justify personnel cost savings; it is the essence of management both to boost revenues and to control costs. Cf. McDonald v. Stroh Brewery Co., 478 N.W.2d 669, 674 (Mich.Ct.App.1991) ("[a]lthough the economic reasons must be bona fide, there is no requirement that they rise to the level of a 'necessity' ").
 
 
 29
 Thus, regardless of whether WAC created policies and practices giving rise to legitimate expectations of termination only for cause, WAC has stated, and Wilson has failed to rebut, a bona fide economic reason for Wilson's dismissal. True, that conclusion is vulnerable to one further line of attack: Wilson also alleged that he was fired in violation of anti-discrimination laws, and under Michigan law an economic benefit to the employer that is incidental to illegal discrimination will not constitute a bona fide economic reason. "Although there may be justification for economic layoffs, an employer may not decide which employees to lay off on the basis of considerations that are prohibited by law, such as race, gender, or age." Featherly v. Teledyne Industries, Inc., 486 N.W.2d 361, 363 (Mich.Ct.App.1992). In the remainder of this opinion, we conclude that WAC did not discriminate against Wilson on the basis of age or disability. Therefore, WAC stated an economic justification that constituted just cause for terminating Wilson regardless of whatever legitimate expectations he might have held under Toussaint, and was thus entitled to summary judgment.
 
 III
 
 30
 We turn, then, to Wilson's claim of age discrimination in violation of Michigan law. In a case brought under ELCRA, as in those brought under the federal Age Discrimination in Employment Act, a plaintiff who lacks direct evidence of discrimination may establish a prima facie case by means of the framework developed in federal discrimination jurisprudence beginning with McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). "To establish a prima facie case of age discrimination ... plaintiff must show that (1) he was a member of a protected class, (2) he was discharged, (3) he was qualified for the position, and (4) he was replaced by a younger person." Barnell v. Taubman Co., Inc., 512 N.W.2d 13, 19 (Mich.Ct.App.1994). Wilson indisputably demonstrated the first three elements. As for the fourth element, Wilson was initially replaced by Smail, who, like Wilson, was 58. According to Smail's deposition testimony, WAC soon pressured him to resign, and replaced him with a fresh hire who was "in his forties". The district court assumed that this indirect replacement of Wilson by a younger person satisfied the fourth element of the prima facie case. We shall assume the same. By making out a prima facie case of age discrimination, Wilson created the rebuttable presumption that WAC had discriminated against him. It fell to WAC to articulate a legitimate, nondiscriminatory reason for his termination. This it did with the economic reasons discussed above. To avoid summary judgment, Wilson, in turn, was then required to surrebut WAC's proffered, permissible explanation by "produc[ing] sufficient evidence from which the jury may reasonably reject the employer's explanation." Manzer v. Diamond Shamrock Chemicals Company, 29 F.3d 1078, 1083 (6th Cir.1994).
 
 
 31
 At this point, analysis breaks free of the McDonnell Douglas framework, and the case is subjected to the ordinary standards for considering a motion for summary judgment, viz., "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). It is well established in federal discrimination jurisprudence that the plaintiff has the ultimate burden of persuading a trier of fact that the defendant illegally discriminated. See, e.g., Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). The court's responsibility at this stage is to determine whether the evidence, taken in the light most favorable to Wilson, would be sufficient for him to sustain that burden before a reasonable jury. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252.
 
 
 32
 We now consider whether Wilson furnished sufficient evidence to avoid summary judgment. We have already considered the evidence contained in the Yarian affidavit regarding hiring by WAC during the period in which Wilson was terminated, and found it legally insufficient to invalidate the economic reason WAC offered for Wilson's dismissal. Wilson offers three other evidentiary bases that he says create a genuine issue of fact: statistical evidence, evidence of ageist comments, and testimony that WAC selected older employees for discharge in order to save on pension costs.
 
 
 33
 Wilson claimed that a pattern of age discrimination was apparent in the fact that six of the seven WAC employees fired at the same time as Wilson had ages of 63, 58, 55, 54, 46, and 39, and that all were older or had more years of service than their replacements. (As earlier noted, the replacements were already WAC employees. Three of the replacements, not counting Smail, were also over forty. One replacement was older than the man he replaced, but had fewer years of service.) The district court rejected this evidence as "not statistically relevant because they represent only a small pool of seven employees." A small base can undermine the significance of proffered statistical evidence. See Black v. City of Akron, 831 F.2d 131, 134 (6th Cir.1987); Fudge v. City of Providence Fire Dep't, 766 F.2d 650, 657-59 (1st Cir.1985). A more fundamental problem is that Wilson fails to compare the number of employees terminated and their ages against the number of employees in the pool of managerial employees from which dischargees were to be selected, and their ages. Only if the percentage of employees over forty in the discharged group convincingly exceeded the percentage of employees over forty among the survivors could any inference of discrimination be drawn. And then the required degree of variance would depend on the size of the base. Cf. United Black Firefighters Ass'n v. City of Akron, 976 F.2d 999, 1011 (6th Cir.1992) (discussing statistical proof of discrimination). Although we know that four of the seven discharged employees (57%) were over age fifty, and that (according to Cecil's affidavit) six employees over age fifty retained their jobs, if a clear statement of the total number of remaining managerial employees is given in the record on appeal it has eluded us. In any event, it is up to Wilson to present persuasive statistical evidence to support his claim of discrimination, and this he has not done. Cf. Fudge, 766 F.2d at 658 ("We think that in cases involving a narrow data base, the better approach is for the courts to require a showing that the disparity is statistically significant, or unlikely to have occurred by chance, applying basic statistical tests as the method of proof.").
 
 
 34
 As for the allegedly ageist remarks, Wilson offered evidence that on one occasion, WAC's chief operating officer referred to Wilson as a "dinosaur." On another occasion, WAC's president said that Wells was a "stodgy" company. Wilson is correct in asserting that derogatory remarks related to age, gender, race or other protected characteristics may serve as direct evidence of discriminatory intent. See, e.g., Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325 (6th Cir.1994); Sischo-Nownejad v. Merced Community College District, 934 F.2d 1104 (9th Cir.1991). However, this circuit has required workplace remarks furnished as evidence of discrimination to be clear, pertinent, and directly related to decision-making personnel or processes in order to prove discriminatory intent. In Phelps v. Yale Security, Inc., 986 F.2d 1020, 1025-26 (6th Cir.), cert. denied, 510 U.S. 861 (1993), we held that where an employer, eight months before laying off the plaintiff, told her that she had been transferred from a more responsible position because she was too old for it, and a month later told her that her fifty-fifth birthday was cause for concern, such comments were too abstract, isolated, and ambiguous to allow a jury verdict for the plaintiff to stand. Similarly, in Gagne v. Northwestern Nat'l Life Ins. Co., 881 F.2d 309, 315-16 (6th Cir.1989), we upheld an order of summary judgment on behalf of a defendant where the defendant employer made an isolated comment that he "needed younger blood." See Cooley, 25 F.3d at 1331. We believe that two remarks made by two different managers at a time not proximate to Wilson's termination are properly characterized as "isolated." And the remarks were ambiguous. Smail, who heard the "dinosaur" remark second-hand (we pass over the problem with hearsay), believed it meant "out of date," or "old-fashioned." Smail believed (contrary to the definitions of the word in Webster's Third New International Dictionary) that the term "stodgy" meant "old." But the company president apparently applied the adjective not to Wilson but to the company as a whole. We conclude that these remarks are not sufficient evidence of discrimination to have defeated WAC's motion for summary judgment.[3]
 
 
 35
 Finally, Wilson offers Smail's testimony that he believed WAC had a policy of terminating employees in the last few years before their retirement in order to save costs of financing their pensions. If this were true, and if it were shown that this was a significant reason for Wilson's selection for termination, we believe that WAC would be guilty of age discrimination under Michigan law.[4] However, Smail's testimony on the pension issue is conclusory. Presumably discovery could have been used to turn up more persuasive evidence, if it existed, on the correlation between age and pension costs. This might have permitted inferences about the importance of pensions in the decision to select Wilson and the other terminated employees.[5] As it is, Smail's unsupported assertions are no more than a scintilla of evidence, and cannot defeat summary judgment.
 
 
 36
 In short, the district court correctly ordered summary judgment for the defendant on the age discrimination count.
 
 IV
 
 37
 Wilson has diabetes and must take insulin; that condition has been recognized as a handicap under HRCA. Hines v. Grand Trunk Western R. Co., 151 Mich.App. 585, 596 (1985). Wilson submits an affidavit from his physician stating, among other things, that "it was recommended that Mr. Wilson see a psychologist or psychiatrist in order to deal with increasing job stress relating from [sic] an increasing work load at his work. This job stress also exacerbated his diabetic condition."
 
 
 38
 Two distinct theories are available to Wilson under HRCA. Wilson could claim that WAC, by firing him, committed a discriminatory employment practice prohibited by M.C.L. § 37.1202. He could also claim that WAC failed to accommodate him as a handicapper as required by M.C.L. § 37.1102.
 
 A. Disability Discrimination
 
 39
 To recover under HRCA, a plaintiff must allege and prove that (1) the plaintiff is "handicapped" as defined by HRCA, (2) the handicap is unrelated to the plaintiff's ability to perform the duties of a particular job, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute. Hall v. Hackley Hospital, 532 N.W.2d 893 (Mich.Ct.App.1995).
 
 
 40
 The district court disposes of Wilson's discrimination claim by interpreting a phrase taken from his deposition ("I believe they took no consideration to the fact that I identified myself as a handicapped person") as a concession that WAC did not discriminate against him on the basis of his handicap. Wilson objects to this interpretation, explaining that when he said WAC "took no consideration," Wilson meant not that WAC was indifferent to his handicap, but that WAC failed to accommodate it. On review of an order of summary judgment, Wilson's interpretation should be credited, especially because what was at best a vague and syntactically inexact statement was made, as surrounding testimony shows, late in the day when Wilson was tired.
 
 
 41
 We think there is a more fundamental reason for affirming the district court's order of summary judgment on this count. Wilson's complaint alleges that he "was discriminated against by the Defendant in the terms and conditions of his employment by virtue of a physical handicap which he had in connection with performing the functions of his job," and that "[a]lthough accommodation was requested in such conditions, the Defendant fully refused and deliberately refused to accommodate the Plaintiff." The complaint does not specifically allege that WAC fired him because of his handicap. The Statement of Issues section of his brief states that "[i]n Count III, Plaintiff argues that the discharge was discriminatory in that Plaintiff was discharged by virtue of a physical handicap which had no connection with performing the essential functions of his job...." However, in the brief's "Argument" section for that count, as well as in the parallel section in his brief below opposing the motion for summary judgment, Wilson discusses only the difficulties he experienced with his workload in the period preceding his termination.
 
 
 42
 At the time of Wilson's discharge, he functioned as corporate safety director. He continually complained that the stress of the job, coupled with the other duties in plant relations were too much.[6] He requested continuously, clarification of his status and assistance in his job duties.... It is undisputed that the Plaintiff advised his employer that he was an insulin-dependent diabetic. It is also undisputed that the Plaintiff requested assistance from the employer concerning stress-related activities and the fact that he was being asked to work literally around the clock in performing [his various functions].
 
 
 43
 Pl.Opp.Brief at 13-15. Wilson never directly avers that either the handicap itself or his requests for less stressful work motivated WAC in its decision to fire him. It is only in the Statement of Issues of his brief on appeal, then, that Wilson makes any reference to the theory that WAC terminated him because of his handicap status. Nor does Wilson ever allege that he was assigned to his duties because of his handicap.
 
 
 44
 In the absence of a direct allegation that WAC discriminated against Wilson on the basis of his handicap, Wilson's claim of disability discrimination could not have withstood a motion to dismiss, much less a motion for summary judgment.
 
 B. Accommodation of Handicap
 
 45
 HRCA § 37.1102 provides that "a person shall accommodate a handicapper for purposes of employment ... unless the person demonstrates that the accommodation would impose an undue hardship."
 
 
 46
 The district court based its order of summary judgment for WAC on this count on the observation that "[i]nterestingly, plaintiff never argues that he requested a change in employment status because of his insulin condition. Rather, plaintiff simply requested to be permitted a less stressful work load because he was under too much stress in his current position.... The Court's position on the accommodation of the request for a less stressful position is immaterial as the Court is aware of no case law construing 'stress sensitivity' as a handicap."
 
 
 47
 We withhold judgment on the district court's conclusion that "stress sensitivity" is not a handicap under HRCA, and its assumption that stress was not so linked to Wilson's diabetes, as a factor that according to Wilson's physician exacerbated the disease, that it was really diabetes, and not "stress sensitivity" that needed to be accommodated. Still, Wilson cannot escape summary judgment on the disability count by claiming a failure to accommodate.
 
 
 48
 Ordinarily, we think of "accommodation" in terms of adjustments an employer makes that allow a handicapped or disabled employee to continue to perform and progress in her job; accommodation is carried out instead of an adverse employment action, such as termination or failure to promote. M.C.L. § 37.1202(f) and (g) pertains to this sort of accommodation. If Wilson had simply stopped doing some of his duties because of diabetes-related stress, and WAC then fired him for nonperformance, accommodation would clearly be an issue. However, we do not think there can be an actionable failure to accommodate under § 37.1102, where, as we concluded above, there was no adverse employment action related to the underlying disability.
 
 V
 
 49
 For the reasons discussed above, the district court's order of summary judgment is AFFIRMED.
 
 
 
 [1]
 Wilson originally submitted these affidavits on the Friday before the hearing on WAC's motion for summary judgment scheduled for Monday, June 26, 1995. Judge McKeague refused to consider them at the time. After that hearing, Wilson submitted a motion to submit a supplemental brief and affidavits, which Judge McKeague granted by order on August 4, 1995. Judge McKeague's memorandum accompanying his order of summary judgment makes no mention of these affidavits or their contents
 WAC expends a good deal of effort in its brief arguing that Judge McKeague could have denied Wilson's motion to submit the supplemental affidavits, and argues that their untimeliness made any refusal by the court to consider them not an abuse of discretion. This court reviews an order of summary judgment de novo, not for abuse of discretion, and, like the district court, bases its judgment on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any...." FED.R.CIV.P. 56(c). Whether the district court paid attention to the affidavits or not, they were properly submitted below, see ibid. ("The adverse party prior to the day of hearing may serve opposing affidavits."), accepted by the court in its order of August 4, 1995, and constitute part of the record on appeal for this court to consider. See FED.R.APP.P. 10(a).
 
 
 [2]
 Context suggests that this policy and practice pertained to managerial employees; in the affidavit, Fulton has just claimed familiarity with "the hiring practices and procedures of middle management people," including himself and Wilson
 
 
 [3]
 We acknowledge that Michigan courts, interpreting Michigan's nondiscrimination laws, have sometimes shown themselves more likely to find that stray or ambiguous remarks created grounds on which a reasonable fact-finder could infer that discrimination was a "determining factor" in an adverse employment decision. For example, in Featherly, 486 N.W.2d at 365, a supervisor asked a certain employee, a month or two before laying him off as part of a large reduction in force, how long he planned to keep working. After announcing the lay-offs, the supervisor asked the employee how old he was and later remarked that the lay-off wouldn't hurt the employee much because he could retire. The Michigan Court of Appeals held that these remarks supported the employee's claim that age was a determining factor in his inclusion in the workforce reduction. And in Wilson v. General Motors Corp., 454 N.W.2d 405, 412-13 (Mich.Ct.App.1990), the court refused to set aside a jury verdict where the evidence of discriminatory animus consisted of two remarks by supervisors (that plaintiffs "should be satisfied with what they had and be grateful that they had a job," and "that they had a lack of skills and that they weren't going anywhere no matter what type of degree they attained") that witnesses believed had "racial overtones," along with evidence indicating that black women were transferred or promoted less frequently. However, we find strong authority for relying on our Sixth Circuit cases. See, e.g., Sumner v. Goodyear Tire & Rubber Co., 398 N.W.2d 368, 388 (Mich.1986) ("Federal cases under Title VII ... are regarded by Michigan courts as highly persuasive guidance in the application of civil rights statutes); Michigan Dep't of Civil Rights v. Horizon Tube Fabricating, Inc., 385 N.W.2d 685, 687 (Mich.Ct.App.1986) ("Michigan courts have frequently relied on federal decisions under Title VII when deciding state employment discrimination claims.")
 
 
 [4]
 In Adama v. Doehler-Jarvis, Division of NL Industries, Inc., 320 N.W.2d 298, 302 (Mich.Ct.App.1982), rev'd on other grounds, 353 N.W.2d 438 (Mich.1984), the court held that it was not a violation of ELCRA for "costs involved in employing older workers, including pension costs, [to be] considered [by employers] where the business decision involves the possible closing out of all operations," so long as the age-related reason was not "a major determinative factor." Here, WAC was not threatened with having to "close out" its operations, so the Adama holding does not pertain. (This circuit has ruled similarly with respect to the ADEA. See EEOC v. Chrysler Corp., 733 F.2d 1183, 1186 (6th Cir.1984) (forced early retirements are not in violation of ADEA only where there is a necessity for drastic cost reduction, such as "the prospect of imminent bankruptcy," and where forced retirements are the least detrimental alternative means available to reduce costs).)
 
 
 [5]
 Conceivably, discovery along these lines could have supported a suit under § 510 of ERISA, 29 U.S.C. § 1140, which prohibits employer action against an employee who participates in a pension benefit plan for "the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."
 
 
 [6]
 At some point around 1993, Wilson was assigned "corporate" (multi-plant) duties as safety director in addition to his human resources duties in Kalamazoo