[Cite as *Pitts-Baad v. Valvoline Instant Oil Change*, 2012-Ohio-4811.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  | : | JUDGES: |
| CHRISTINA PITTS-BAAD | : | Sheila G. Farmer, P.J. |
|  | : | John W. Wise, J. |
| Plaintiff-Appellant | : | Julie A. Edwards, J. |
|  | : |  |
| -vs- | : | Case No. 2012 CA 00028 |
|  | : |  |
|  | : |  |
| VALVOLINE INSTANT OIL CHANGE, | : | O P I N I O N |
| et al., |  |  |
|  |  |  |
| Defendants-Appellees |  |  |


CHARACTER OF PROCEEDING:      Civil Appeal from Stark County
Court of Common Pleas Case No.
2011-CV-00576

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      October 15, 2012

APPEARANCES:

For Plaintiff-Appellant      For Defendants-Appellees

LEWIS A. ZIPKIN      CARLY E. CHU
GREER A. HOPKINS      RYAN W. GREEN
Zipkin Whiting Co., L.P.A.      Dinsmore & Shohl, LLP
The Zipkin Whiting Building      Suite 1900
3637 South Green Road      255 East Fifth Street
Beachwood, Ohio 44122      Cincinnati, Ohio 45202

*Edwards, J.*

{¶1} Plaintiff-appellant, Christina Pitts-Baad, appeals from the January 6, 2012, Judgment Entry of the Stark County Court of Common Pleas granting the Motion for Summary Judgment filed by defendants-appellees Valvoline Instant Oil Change, Brian Fleming and Ashland, Inc.

STATEMENT OF THE FACTS AND CASE

{¶2} On September 8, 2009, appellant was hired by appellee Valvoline Instant Oil Change ("Valvoline") by Area Manager Nancy Regula as an Assistant Manager. Appellee Valvoline is a division of appellee Ashland, Inc. Appellant had been told that she was on the fast track Assistant Manager program and that she would have 90 days to pass all certifications and the panel interviews for the Certified Technician, Senior Technician and Assistant Manager positions. Appellant knew that if she did not pass the same, she could be either terminated or demoted.

{¶3} Appellant passed her Certified Technician certification on the first try, but failed her Senior Technician certification after she failed the customer service component of the exam. Appellant retook the Senior Technician certification and passed on her second attempt. Appellant failed the Assistant Manager panel interview and did not pass the same within 90 days of her hiring. However, she was not terminated and was permitted to continue working as a Senior Technician, but at the higher salary and title of an Assistant Manager.

{¶4} On June 29, 2010, appellant, who was approximately eight months pregnant at the time, tripped over a cord and fell onto the floor of the service center. After the Manager asked her if she was okay, appellant indicated that she thought that

she was and went back to work. She continued working and later that evening, while at home, started to worry about her fall.  The next morning, appellant called her doctor's office and after speaking with the nurse midwife, decided that she needed to follow "the injury procedures and make the report that I had fallen at work." Appellant's Deposition Transcript at 40. Appellant then followed company policy and called 1-800-ASHLAND to report her injury. When asked why she had not followed company procedure on June 29, 2010, appellant responded that she did not believe that there was an injury at that time and that "the general practice was if there was not an injury requiring medical attention, no one ever called." Appellant's Deposition at 45. No one told appellant on June 29, 2010, not to report her injury or fall.   On July 1, 2010, appellant met with Brian Fleming and another Manager who told her that she should have reported her injury on the day it happened.  Appellant went on medical leave and did not work after July 1, 2010, before she took her maternity leave.  Although she was ineligible for FMLA [Family & Medical Leave Act] leave, the Company offered appellant a medical leave of absence starting on July 1, 2010.

{¶5}   According to appellant, when she returned from maternity leave on October 4, 2010, the work environment was different and employees were "distrusting." Appellant's Deposition at 66. Appellant testified that she was able to pump breast milk while working at appellee Valvoline during her breaks. Appellant used the only available closed space with a lock in the service center, which was a public bathroom. The toilet seat in the bathroom had no lid and was broken and the bathroom, according to appellant, was dirty. Appellant sat on the broken toilet seat while pumping her breast milk. While appellant indicated that, at longest, she could go up to four hours without

expressing milk, at times she had to wait longer. On one occasion, appellant had to wait approximately six hours before expressing her milk. The following testimony was adduced when she was asked during her deposition whether she talked with anyone at appellee Valvoline or appellee Ashland about such incident:

{¶6} "Q. Did you talk with anybody at Valvoline or Ashland after the incident the day that you just described for us about what happened?

{¶7} "A. No.

{¶8} "Let me correct that.

{¶9} "Q. All right.

{¶10} "A. I had mentioned to other employees. I don't remember specifically who, but I know I had brought the time thing up after that point, that 'Hey, I can't go that long I've got to go - -' and I did it almost on a daily basis, so I think almost everybody in the shop was aware that I was supposed to be going on my break somewhere in that timeframe.

{¶11} "Q. The four-hour mark - -

{¶12} "A. Uh-huh.

{¶13} "Q. - - at the maximum end of time?

{¶14} "A. Right.

{¶15} "Q. All right.

{¶16} "A. Which usually was about mid shift, so for the most part - - for the most part, they could close to accommodate it, but there were several times where they would just say 'We're too busy. You can't go yet,' and it extended past that four-hour mark." Appellant's Deposition at 95-96.

{¶17} When appellant requested to take an early break to express breast milk, her supervisor usually allowed her to take the break within a half hour or forty-five minutes. Appellant indicated that she did not recall bringing up breastfeeding during her conversation with Brian Fleming, who was an Area Manager, after she returned to work from maternity leave and did not recall complaining to anyone else at the company about the issues involving breastfeeding.

{¶18} On November 9, 2010, appellant, who was working as the Manager, and Michael Bruno, a relatively new Technician, were working at the store when a Jeep with a diesel motor came in for an oil change. Appellant had previously serviced the same Jeep and knew that it had had a problem with its drain plug at another Valvoline Oil Change store.   Appellant was working topside while Bruno was working underneath the car. During the oil change, after Bruno was taking much longer than normal to perform his duties, appellant bent down and asked him what was going on and whether everything was okay. Bruno indicated that he was having a hard time getting the drain plug out of the vehicle.   When appellant asked Bruno if they were good now, Bruno responded "I think so." Appellant's Deposition at 175.   According to appellant, Bruno indicated that the drain plug was tight.   Bruno asked appellant if she could add a small amount of oil to make sure that the plug would not leak. Although she knew that it was not standard procedure to add oil, appellant added about a quart, which she admitted was unusual. Appellant admitted that she did not 100% follow appellee Valvoline's SuperPro procedures.

{¶19} One or two days later, the owner of the Jeep brought it into appellee Valvoline's Belden Village store where it was determined that the drain plug was

stripped and the oil pan was damaged. The repair cost appellee Valvoline approximately $1,000.00. It was the second time that appellee Valvoline had replaced the same drain pan.  Both appellant and Bruno were terminated.

**{¶20}** On February 17, 2011, appellant filed a complaint against appellees Valvoline Instant Oil Change, Ashland, Inc., and Brian Fleming, area manager for appellee Valvoline.   Appellant, in her complaint, set forth claims of gender discrimination, retaliation for reporting a workplace injury, retaliation for complaining about gender discrimination, negligent retention and supervision and intentional infliction of emotional distress. Appellees filed a Motion for Summary Judgment.

**{¶21}** Pursuant to a Judgment Entry filed on January 6, 2012, the trial court granted summary judgment in favor of appellees on appellant's gender discrimination and retaliation claims.  On January 25, 2012, appellant filed a Motion to Reinstate and Notice of 41(A) Voluntary Dismissal with prejudice of her claims for negligent retention and supervision and intentional infliction of emotional distress. As memorialized in a Judgment Entry filed on February 6, 2012, the trial court granted such motion and issued a final appealable order.

**{¶22}**  Appellant now raises the following assignments of error on appeal:

**{¶23}** "I. THE TRIAL COURT  ERRED IN FAILING TO FIND THAT GENUINE ISSUES  OF  MATERIAL  FACT  EXIST  THAT  PLAINTIFF-APPELLANT  WAS SUBJECTED  TO  GENDER  DISCRIMINATION  DURING  HER  EMPLOYMENT  AT DEFENDANT'S-APPELLEES.

**{¶24}** "II. THE TRIAL COURT ERRED IN NOT FINDING GENUINE ISSUES OF MATERIAL FACT THAT PLAINTIFF-APPELLANT WAS SUBJECT TO RETALIATION FOR COMPLAINING ABOUT GENDER DISCRIMINATION."

SUMMARY JUDGMENT

**{¶25}** Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.,* 30 Ohio St.3d 35, 36, 506 N.E.2d 212 (1987). As such, we must refer to Civ.R. 56 which provides, in pertinent part: "* * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in the party's favor. * * * "

**{¶26}** Pursuant to the above rule, a trial court may not enter a summary judgment if it appears a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the non-moving party has no evidence to prove its case. The moving party must

specifically point to some evidence which demonstrates the non-moving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Vahila v. Hall,* 77 Ohio St.3d 421, 429, 1997–Ohio–259, 674 N.E.2d 1164, citing *Dresher v. Burt,* 75 Ohio St.3d 280, 1996-Ohio-107, 662 N.E.2d 264.

{¶27} It is pursuant to this standard that we review appellant's assignments of error.

I

{¶28} Appellant, in her first assignment of error, argues that the trial court erred in granting summary judgment in favor of appellees on appellant's gender discrimination claims.  We disagree.

{¶29} Appellant alleges that appellees discriminated against her by failing to accommodate and/or provide reasonable accommodations for her during her breastfeeding, and by failing to offer her training, job opportunities and job duties as her similarly situated male counterparts. She further alleges that appellees discriminated against her by, during the interview process and for promotion, asking her questions of increased difficulty than similarly situated male counterparts and by giving her less hours than male employees.

{¶30} R.C. 4112.02(A) prohibits sex discrimination in all matters related to employment. *Birch v. Cuyahoga Cty. Probate Court,* 173 Ohio App.3d 696, 2001-Ohio-6189, 880 N.E.2d 132, ¶ 20 (8th Dist.). "Ohio courts apply federal case law interpreting Title VII of the Civil Rights Act of 1964 to claims arising under R.C. Chapter 4112 to the

extent that the terms of the statutes are consistent." *Id.,* citing *Genaro v. Cent. Transport, Inc.*, 84 Ohio St.3d 293, 298, 703 N.E.2d 782 (1999), citing *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981).

{¶31} Sex discrimination in employment may be proved either by "direct" evidence or by "indirect" evidence and application of the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Klaus v. Kilb, Rogal & Hamilton Co. of Ohio* (S.D.Ohio 2006), 437 F.Supp.2d 706, 725-726 (S.D. Ohio 2006); *Birch,* supra, at ¶ 21-23.

{¶32} "In employment discrimination claims, 'direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' *Laderach v. U-Haul [of Northwestern Ohio* (C.A. 6, 2000), 207 F.3d [825,] * * * 829. Direct evidence proves the existence of a fact without any inferences or presumptions. *Id.* To establish 'direct evidence' of discrimination through a supervisor's comments made in the workplace, the remarks must be 'clear, pertinent, and directly related to decision-making personnel or processes.' *Dobbs-Weinstein v. Vanderbilt University,* 1 F.Supp.2d 783, 798 (M.D. Tenn. 1998), aff'd, 185 F.3d 542 (6th Cir. 1999) (quoting *Wilson v. Wells Aluminum Corp.,* 1997 U.S.App. LEXIS 2331, 1997 WL 52921 No. 95-2003, * * * (6th Cir. Feb. 7, 1997) (unpublished))." *Klaus,* supra, at 725.

{¶33} As direct evidence of gender discrimination,[1] appellant notes that, when she was going through training after first being hired, she was later told by Jeremy

---

[1] While appellant, in alleging direct evidence of discrimination, cited to testimony from Nancy Regula, a former employee of appellee Valvoline, we note that Regula testified about her own experiences while

Green, a manager, that "he was harder on me than what he normally was on people when they first started because he figured I would quit." Appellant's Deposition at 105. As noted by appellees in their brief, appellant never alleged that Green indicated that he was harder on her because she was a woman or that he was harder on her than he normally was on men.    Such comments are not direct evidence of gender discrimination, since they did not clearly refer to her gender. See *Creech v. Ohio Cas. Ins. Co.,* 944 F.Supp. 1347, 1358-59 (S.D. Ohio 1996) (gender-neutral comments are insufficient to show discriminatory animus).

{¶34} Appellant also contends that she has direct evidence of discrimination because manager Justin Legg refused to order her new uniform pants from Cintas when she was pregnant.  The uniforms were provided by appellee Valvoline to its employees. Appellant, during her deposition, testified that as her pregnancy progressed, her pants got tighter and tighter and that she was no longer able to button them. During her deposition, appellant testified that Justin Legg told her, after she complained, that she was just going to have to go and buy maternity pants and that he was not going to order her new uniforms because she had gained weight.

{¶35} However, according to appellant, Justin Legg told her that he had lost 20 or 30 pounds and that even though his pants were baggy, he never ordered new pants for himself. Appellant specifically testified, in relevant part, as follows:

{¶36} "A. I don't know if this fits into what you're asking, but Justin, when I was pregnant and I had gotten quite a ways along - - we have uniforms from Cintas that we

---

employed at appellee Valvoline.  As noted by appellees, her statements were not relevant to appellant's discrimination claims because appellant never alleged that she experienced the incidents cited by Regula.  Regula ceased working for appellee Valvoline in August of 2010, which is before appellant was terminated.

wear at the shops and then they get cleaned. So the uniforms are provided, and my uniform pants specifically were a size 10, and as my belly started to grow, my pants got tighter and tighter, of course, and it got the point where I couldn't button them any longer, and I spoke with Justin and I said, you know, 'What should I do? You know, my pants don't fit,' and he said 'Well, I can't order you new ones, so I guess you're just going to have to go buy some pants,' and I said 'Well, if they don't fit,' I said, 'I'm supposed to go spend, you know, $20 apiece on a pair of pants,' and he said 'You can buy those maternity pants,' and I told him 'Well you can't tuck a shirt into maternity pants,' and he said 'Well, I'm not going to order you new uniforms just because you gained weight,' and then he told me that he lost several pounds, I think he said 20 or 30 pounds, he lost 20 or 30 pounds and look how baggy his pants were and he never ordered new pants.

{¶37} "So I was several weeks walking around with my pants unbuttoned and unzipped, with only a belt holding them up and with my shirt pulled down to try to cover the opened zipper while I was trying to figure out how I was going to get new pants or what I was going to do for new uniforms pants, and none of my maternity pants or anything else - - they told me they had to be the dark blue, just like the Valvoline pants, the uniform pants, and nothing I could find didn't have the panel on it, and finally one day I came in to work and Justin said "Hey, I ordered you knew (sic) uniform pants,' and I said "how did you do that? You don't know what size,' and he said 'Well, I just guessed and I ordered you a size 14,' and those size 14 pants were what I still had when I was fired in November. Even though I was back down to nearly a size 10, I was still wearing a size 14 pants." Appellant's Deposition at 136-137.

**{¶38}** Thus, as evidenced by appellant's own testimony, there is no evidence that Legg's initial refusal to buy appellant another pair of work pants was motivated by her gender. Moreover, Legg did eventually order appellant new uniform pants.

**{¶39}** Appellant also maintains that appellees discriminated against her on the basis of gender by failing to accommodate her breastfeeding. However, there is no gender discrimination cause of action for an employer's failure to accommodate a breastfeeding employee. See *Martinez v. N.B.C.*, 49 F. Supp.2d 305 (S.D.N.Y. May 18, 1999) ("In this case, there is and could be no allegation that Martinez was treated differently than similarly situated men. To allow a claim based on sex-plus discrimination here would elevate breast milk pumping—alone—to a protected status. But if breast pumping is to be afforded protected status, it is Congress alone that may do so. Accordingly, Martinez fails to state a *prima facie* claim of gender discrimination." Id at 310-311 (footnote omitted). See also *Vachon v. R.M. Davis,* No. 03-234-P-H, 2004 WL 1146630, (D. Me. April 13, 2004).

**{¶40}** Moreover, by appellant's own testimony, it is clear that appellees made efforts to accommodate appellant's need to pump her breast milk. Appellant, during her deposition, testified that she was told to express milk when she was on a break. She further testified that she was permitted to use a bathroom, which was the only available space with a locked door. On most occasions appellees were able to accommodate appellant's need to express her milk near the four hour mark. In addition, Jeremy Green, who was appellant's supervisor after she returned from maternity leave in October of 2010, stated, in his affidavit that was attached to appellees' Motion for Summary Judgment, that he permitted appellant to express milk during her lunch

breaks, that he permitted her to eat her lunch while on the clock after she used her break to express breast milk, and that appellant never complained to him about the frequency of her breaks or with the conditions of the bathroom she used while expressing milk. During his deposition, he testified that there was never time when employees were allowed cigarette breaks, but appellant was not allowed to express breast milk.

{¶41} Appellant, as alleged direct evidence of gender discrimination, also points to comments made to her by Nick Gaston. Appellee Valvoline had instituted a policy requiring that there be a woman in every store. Appellant, during her deposition, testified that Nick Gaston, a Technician, told her that such policy was instituted after "some girl made a fit" and that he did not like girls in the shop and did not think that they belonged there. Appellant's Deposition at 129. Appellant also testified that Gaston indicated that the women appellee Valvoline hired should be cute. When appellant complained to Justin Legg, the Service Manager, he told her that she had to understand that "this was a guy's place and it's going to be really hard for them to let a woman come in, because this was their territory…" Appellant's Deposition at 131. However, comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination. *See Hopson v. DaimlerChrysler Corp.,* 306 F.3d 427, 433 (6th Cir. 2002) (holding that a company manager's opinion that "race was a factor" in the company's decision not to promote the plaintiff was not direct evidence for purposes of the plaintiff's discrimination claim because the manager had "no involvement in the decision-making process with respect to the particular jobs at issue"). Because Gaston was not a decision-maker with

regard to appellant's employment, his statements cannot be considered direct evidence of gender discrimination against appellant. See also *Carter v. University of Toledo* 349 F.3d 269, 273 (6th Cir., 2003). Appellant also contends that she was given the dirtiest job and was told to "clean the bathroom because it was a girl's job." Appellant's Deposition at 108-109. Appellant testified that such statement was made by one of the Technicians, who clearly was not a decision-maker with respect to appellant's employment.

{¶42} Based on the foregoing, we find that appellant has failed to establish gender discrimination through direct evidence.

{¶43} The next issue for determination is whether or not appellant established gender discrimination though indirect evidence. With respect to the indirect method of proof, the Ohio Supreme Court has adopted the analytical framework in cases involving claims of racial or gender discrimination that was established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework, a plaintiff-employee establishes a prima facie case of discrimination by producing evidence of each of the following elements: 1) he or she was a member of the statutorily protected class; 2) he or she suffered an adverse employment action; 3) he or she was qualified for the position; and, 4) a comparable, non-protected person was treated more favorably. *Brewer v. Cleveland Bd. of Edn.*, 122 Ohio App.3d 378, 385, 701 N.E.2d 1023 (8th Dist. 1997), citing *McDonnell Douglas.*

{¶44} Only after the plaintiff-employee establishes a prima facie case, does the burden shift to the defendant-employer to overcome the presumption inherent in the

prima facie case by propounding a legitimate, nondiscriminatory reason for adverse actions taken against the employee. Then if the employer meets this test, the plaintiff must show that the rationale set forth by the employer was only a pretext for unlawful discrimination.

{¶45} Appellant, in the case sub judice, as indirect evidence of discrimination, alleged that she did not receive the same training as was offered to male employees. The trial court found that appellant was unable to establish a prima facie case of gender discrimination because she was "unable to point to a similarly situated employee who received more favorable treatment with respect to training." In *Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1116 (6th Cir. 2001), the court held that employees must be treated similarly if they are "similarly situated in all respects," citing *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992) ("[T]he individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").

{¶46} Appellant now argues that Assistant Manager Jon Newman was similarly situated to her and that he received more favorable treatment than her with respect to training. However, unlike appellant, Newman was not hired into the company as an Assistant Manager. There was evidence that Newman had been with the company since he was 16, had trained for many years, and then was promoted when he was 18 or 19. See Deposition of Nancy Regula at 52. In contrast, appellant was hired as an Assistant Manager. She testified during her deposition that she was on a "fast track"

and had 90 days to pass the required tests and interviews for the Technicians', Senior Technicians and Assistant Manager positions. Clearly, appellant and Newman were not similarly situated. Moreover, while appellant maintains that, because of her gender, the Assistant Manager panel was harder on her than on Newman, Nancy Regula, who was an Area Manager at the time of appellants hire, testified that the panel was not harder on appellant because she was a woman, but rather they were harder on appellant because of appellant's attitude. Regula, during her deposition, testified, in relevant part, as follows:

{¶47} "Q. Did Ms. Pitts ever complaint to you that at her assistant manager panel, she received more difficult questions that her male coworker?

{¶48} "A. Yes.

{¶49} "Q. Tell me about that.

{¶50} "A. I agreed with her with that, and I think her and I discussed it that I thought that that day during those panels they were nasty to her and that I didn't think that - - and you're going to ask me which three did it, and I don't remember. She may. But they were hard on her. And her and I had had that discussion because I think she failed the first one and I thought because they were a little crappy to her and a little harder than - -

{¶51} "Q. John Newman?

{¶52} "A. Right. But in their defense, it wasn't because of her being the female. It was because of her attitude and her - - I mean she sat there and in front of them threw me under the bus and said it was lack of training on my part as well and lack of training

on their part when it's not all about what we can teach you.  You have to study and do your part at home too."  Deposition of Nancy Regula at 57.

{¶53} Appellant also alleges that Jason Strayley received more favorable training than her because he did not have to take panels while she did.  However, like Newman, Strayley was not hired directly as an Assistant Manager and was not subject to the "fast track."  As noted by appellees, "Strayley and Newman were not required to complete the same training regimen as [appellant], and thus they were not subject to the same standards,…"  Moreover, Nancy Regula testified that years ago, when Strayley was made an Assistant Manager, there were not Assistant Manager panels and that if Strayley had been made an Assistant Manager during the last three or four years, he would have taken the panels.  Thus, panels were mandatory for all employees at the time appellant was hired.

{¶54} Furthermore, it is significant to note that while appellant failed to complete the required training within the 90 day period and could have been terminated or demoted, she was permitted to maintain her title of Assistant Manager and to receive the Assistant Manager salary.  As is stated above, appellant knew that she could be terminated or demoted if she did not timely complete the same.  Appellant was not terminated or demoted even though she failed to pass her Assistant Manager panels for over a year.  In addition, appellant herself testified that after she asked for more training, she was permitted to travel to another store to work with another Service Center Manager.  Thus, there is evidence that appellant was treated more favorably than males in the work place.

{¶55} We thus concur with the trial court that appellant failed to identify any "similarly-situated" male employee who received more favorable treatment than her in terms of training.

{¶56} Appellant also maintains that the trial court failed to consider "the disparity in disciplinary process that pervasively fills the record." Appellant specifically contends that the trial court failed to consider the disciplinary records of Jason Strayley, Leroy Dinger and Linden Bowen.

{¶57} Appellant contends that Strayley, an Assistant Manager, was disciplined more than her but not terminated and that this is indirect evidence of discrimination. Appellant argues that Strayley had 14 disciplinary actions due to poor work performance, attitude and failing to follow policies and is still employed whereas she was terminated even though she had only 5 disciplines. She further notes that he was given a written warning for failing to follow the ten-step SuperPro policy but was not terminated while she was fired for failing to follow such policy.

{¶58} However, at the time of his August 3, 2011 deposition, Strayley had been employed by appellee Valvoline nearly 11 years. During such time, he was disciplined 11 times.[2] In contrast, appellant was employed by appellee Valvoline from September 8, 2009, until November of 2010. During this time, appellant was on maternity leave from July 1, 2010 to October 4, 2010. During this short period of time, appellant received 5 disciplines. Appellant was written up on March 25, 2010 (for arriving late to work), May 22, 2010 (for arriving later to work), June 18, 2010 (for acting unprofessional in front of a customer), June 21, 2010 (for forgetting to fax an employee schedule) and

---

[2] Appellant asserts that Strayley received 14 disciplines. However, 3 of the so-called disciplines were suggestions for improvement. Two of the same were contained in performance evaluations.

November 5, 2010 (for failing to meet dollars over posted). Appellant, during her deposition, testified that there was nothing inappropriate about the discipline that she received.

{¶59} With respect to Strayley, appellant also notes that, in August of 2007, he was written up for failing to follow the ten step SuperPro policy, but was not terminated while she was terminated after failing to follow the same. However, in Strayley's case, the problem was caught before the car drove off of the lot and there was no damage to the car. In contrast, in appellant's case, the damage to the car totaled nearly $1,000.00. More significantly, appellant knew that the exact same vehicle had had problems in the past with respect to an oil change and, based on Bruno's indications that he was having trouble with the drain plug, should have been more careful. There is no dispute that appellant did not follow appellee Valvoline's oil change procedures.

{¶60} Appellant also alleges that she was treated less favorably than Leroy Dinger and Linden Bowman. Dinger, a Senior Technician, admitted during his deposition that he was stoned at work a couple of times and that once a manager told him not to come to work smelling of pot. Appellant notes that Dinger was not terminated or even sent for drug testing. However, there is no evidence that appellant "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." See *Mitchell,* supra. Appellant was not terminated for drug usage, but rather after her failure to follow SuperPro procedures which cost appellee Valvoline money.

{¶61} With respect to Bowman, a Manager, appellant alleges that he stripped the diesel oil pan on the same Jeep and was not terminated. However, Brian Fleming,

an Area Manager with appellee Valvoline, stated, in his affidavit which was attached to appellees' reply brief in support of their Motion for Summary Judgment, in relevant part, as follows:

{¶62} "3. I work for VIOC [Valvoline Instant Oil Change] as an Area Manager and have been employed in this position since June 7, 2010.

{¶63} "4. As it relates to the Jeep Liberty that is the subject of Pitts' case, there is no evidence that Linden Bowman was responsible for stripping the Jeep's oil pan. Further, Bowman's conduct did not result in any claims being brought against the Company by the Jeep's owner.

{¶64} "5. During an oil change in November, 2010, the Jeep's oil open was tripped.  The customer demanded that a new oil pan be installed by a Jeep dealership at the Company's expense.

{¶65} "6. On November 15, 2010, a check for $933.17 was issued by the Company to the dealership to cover the costs of the replaced oil pan in the Jeep.  This was the only claim that the Jeep's owner brought against the Company.

{¶66} "7. It was determined that Pitts and a technician, Michael Bruno, were responsible for the damage cause to the Jeep and the resulting claim.  I made the decision to terminate both Pitts and Bruno solely based on their involvement with the damage to the Jeep Liberty's oil pan and resulting claim of nearly $1,000."

{¶67} Thus, unlike in appellant's case in which the damage to the Jeep cost the Company approximately $1,000.00, any damage that Bowman caused did not result in a claim against appellee Valvoline. Moreover, at the time she worked on the same Jeep, appellant was aware that there had been problems with the Jeep in the past and, based

on Bruno's indications to her, should have been aware that he was having problems during the oil change.

**{¶68}** In addition, as noted by the trial court, Michael Bruno, a male technician with no history of complaints or injury reports, also was terminated along with appellant for his role in the damage to the Jeep that resulted in nearly $1,000.00 in damage. While appellant argues that Bruno, a "low-level technician", was not comparable to her because she was an Assistant Manager, we note that appellant, as the Assistant Manager on duty, was responsible for ensuring that the work was done properly. Because appellee Valvoline articulated a legitimate, nondiscriminatory reason for its decision to terminate appellant, appellant was required to produce sufficient evidence that such reason was merely pretextual. In order to establish pretext, an employee must show by a preponderance of the evidence that the proffered reasons for her termination had no basis in fact, did not actually motivate her termination, or were insufficient to motivate her termination. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Appellant has not met such burden As noted by the trial court, "[w]hile she may not agree with the business decision of VIOC, there is no evidence from which the jury could reasonably conclude that the decision was motivated by unlawful discrimination."

**{¶69}** Finally, we note that appellant contends that she worked fewer hours than her male counterparts and was treated "disparately with regard to assigned hours of work, finding coverage for her shifts, and receiving personal visitors at work." Appellant, however, produced no evidence supporting such allegations. With respect to the hours that she worked, appellant testified that she was told that she was being assigned less

hours because she "was too expensive, I screwed up labor." Appellant's Deposition at 155. As is stated above, appellant, who was performing a Senior Technician's duties, was receiving the salary of an Assistant Manager. Thus, it was cost-effective to send appellant home to save on labor costs.

**{¶70}** In short, based on the foregoing, we find that, reviewing the record in its entirety, the trial court did not err in granting summary judgment in favor of appellees on appellant's gender discrimination claim.

**{¶71}** Appellant's first assignment of error is, therefore overruled.

II

**{¶72}** Appellant, in her second assignment of error, argues that the trial court erred in granting summary judgment in favor of her on her claim that she was retaliated against for complaining about gender discrimination.

**{¶73}** "Ohio law prohibits retaliating against an employee who has opposed any unlawful discriminatory practice or has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under R.C. 4112.01 through 4112.07. R.C. 4112.02(I). When analyzing retaliation claims, Ohio courts rely on federal case law. *Chandler v. Empire Chem., Inc., Midwest Rubber Custom Mixing Div.* (1994), 99 Ohio App.3d 396, 402, 650 N.E.2d 950, 954. To prove a claim of retaliation, a plaintiff must establish three elements: (1) that she engaged in protected activity, (2) that she was subjected to an adverse employment action, and (3) that a causal link exists between a protected activity and the adverse action. Once a plaintiff successfully establishes a prima facie case, it is the defendant's burden to articulate a legitimate reason for its action. If the defendant meets its burden, the burden

shifts back to the plaintiff to show that the articulated reason was a pretext." *Peterson v. Buckeye Steel Casings* 133 Ohio App.3d 715, 727, 729 N.E.2d 813, 821-822 (10 Dist., 1999).

**{¶74}** The parties in this case disagree as to whether or not appellant complained about gender discrimination. Appellant, in her brief notes that during her deposition, she testified that she complained about gender discrimination to Justin Legg, Jeremy Green, Nancy Regula, who was Area Manager, and Ryan, another Area Manager. Appellees, in turn, point out that during her deposition, appellant, when asked if she had complained that she was being trained differently, testified that she "didn't specify that it was because I was female, but I raised the issue numerous times that I was not receiving training that was required - - …" Appellant's Deposition at 151. Appellees also note that appellant admitted that she did not complain about her breast feeding concerns to anyone at appellee Valvoline or appellee Ashland.

**{¶75}** However, regardless of whether or not appellant complained, we find that the trial court did not err in granting summary judgment in favor of appellees on appellant's retaliation claim. As is discussed above, appellees set forth a legitimate, non-discriminatory reason for terminating appellant. Appellant, along with Michael Bruno, was terminated after an improper oil change resulted in nearly $1,000.00 in damage to the Jeep. Appellant clearly knew that there had been a previous problem with the same Jeep's drain plug and should have been aware, based on Bruno's comments to her, that he was having problems during the oil change. There is no dispute that appellant did not follow appellee Valvoline's oil change procedures and, added oil to the Jeep when she knew that it was improper to do so. When asked why

she thought that she was fired from appellee Valvoline, appellant testified, in relevant part, as follows:

**{¶76}** "A. I was told it was because I was the manager on duty during the process of the claim. That was the official reason that I was told.

**{¶77}** "Part of the reason that I believe is because several times I had been - - let me rephrase that. Not several times, but a couple times I had had write-ups for different things.

**{¶78}** "I had one write-up from Jeremy Green." Appellant's Deposition at 184.

**{¶79}** Appellant has failed to provide any evidence that the stated reason for her termination was pretextual.

**{¶80}** We find, therefore, that the trial court did not err in granting summary judgment in favor of appellees on appellant's retaliation claim.

{¶81} Appellant's second assignment of error is, therefore, overruled.

{¶82} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.

By: Edwards, J.

Farmer, P.J. and

Wise, J. concur

_____

_____

_____

JUDGES

JAE/d0807

[Cite as *Pitts-Baad v. Valvoline Instant Oil Change*, 2012-Ohio-4811.]

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| CHRISTINA PITTS-BAAD | : | |
| | : | |
| Plaintiff-Appellant | : | |
| | : | |
| | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| VALVOLINE INSTANT OIL CHANGE, et al., | : | |
| | : | |
| | : | |
| Defendants-Appellees | : | CASE NO. 2012 CA 00028 |

For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.

_____

_____

_____

JUDGES